

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00064-CR

_____


JONATHAN RAY SHEPHERD, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 16,605


Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

O P I N I O N

During his elder son's football game, Jonathan Ray Shepherd shot and killed Cheyenne Green, the mother of his youngest son, in the parking lot of the Gilmer High School football stadium. After an Upshur County jury found Shepherd guilty of the capital murder of Green, the trial court sentenced him to the mandatory punishment of life imprisonment without parole.[1] In his appeal to this Court, Shepherd asserts that the trial court erred (1) in admitting out-of-court statements of Green in violation of his right to confront and cross-examine witnesses under the Sixth Amendment, (2) in refusing his request to charge the jury on the lesser-included offense of felony murder, and (3) in admitting into evidence his videotaped statement to the police. We find that (1) the trial court did not abuse its discretion in admitting Shepherd's second videotaped statement, (2) the trial court did not abuse its discretion in admitting Green's out-of-court statements, and (3) the evidence did not support the submission of a felony murder charge. Since we find no error, we affirm the judgment of the trial court.

I.      Background

A.      The Night of the Shooting

On the night of September 26, 2013, Shepherd attended his elder son's eighth-grade football game with his wife, Susan Bates, and her parents. Shepherd's two-year-old son by Green, Teddy,[2] was also attending the game with Shepherd. By pre-arrangement, Green was waiting in

---

[1]*See* TEX. PENAL CODE ANN. §§ 12.31(a)(2), 19.03(a)(2), (b) (West Supp. 2015).

[2]Pursuant to Rule 9.10(a)(3) of the Texas Rules of Appellate Procedure, we will refer to Shepherd's youngest son, a minor, as "Teddy." *See* TEX. R. APP. P. 9.10(a)(3).

her car in the parking lot waiting for Teddy, and Shepherd left the stands about halftime to deliver the little boy to his mother. According to Shepherd,[3] when he got to the parking lot, he saw Green's car parked beside his truck, and he observed Green walk from her car, pick Teddy up and kiss him, and then place the child in Shepherd's truck to change his diaper. As Green changed Teddy's diaper, Shepherd retrieved his Glock .357 pistol from his truck's back seat and put it in his pocket. After the diaper had been changed, Green put Teddy in his car seat in her car and instructed him to bid farewell to his father. Shepherd walked to the passenger side of Green's car, leaned into the car to kiss Teddy, and told him goodbye. Shepherd then leaned down and told Green that his chest was hurting and asked Green if she knew what a heart attack felt like. Green responded negatively, and Shepherd asked her to take him to the emergency room, getting into the back seat of Green's car and shutting the door. Nevertheless, Green refused to drive him to the hospital and began dialing on her cell phone. Shepherd asked the identity of the person she was calling, and Green told him that she was calling Bates, Shepherd's wife. Although Shepherd protested that Bates was still in the stands and that he needed to go immediately to the hospital, Green still refused to transport him there.

In his statement, Shepherd related that he then became frustrated and believed Green to have mistreated him several ways, despite what he characterized as his kind and generous treatment of her. He related,

> I'm doing all these good deeds and then like, she don't even appreciate it[. ]I'm sitting there crying out for her help so I got upset, you know, and so that's when I leaned over the seat with the gun and said, "Hey, just go. We need to go now. I don't feel good – I'm telling you that." Well, when I – when she seen that it scared

---
[3]Although Shepherd did not testify, his second videotaped statement was introduced at trial.

3

her and freaked her out, you know, and so by that time, you know, she's sitting there fidgeting with the phone. I said, "Drive the car," okay. She didn't – she sat there – "Jonathan, put it away. Put it away." I – "Drive the car." "Put it away. Put it away," so she made a – she opened up her door to get out and I guess run or whatever and I – I'm not certain 100% but I don't know if I fired off a shot then but – but I was never ever intending to hit her.

. . . .

I was all trying to get her attention. Well when she got out of the car then I remembered getting out of the backseat, going around the other side of the car – she's sitting on the ground, kinda like screaming and crying.

. . . .

. . . [S]he's sitting there screaming and crying so I discharged my firearm – I know once that I know of – I if I did more than that, then I don't remember.

Shepherd also stated that Green was sitting on the ground on her buttocks screaming after the first shot and after the second shot, she reclined on the ground and was mumbling. He maintained that he could not say for certain that he had the gun pointed straight at her, but that it was pointed in her direction. He then jumped in his truck, called Bates, told her he had messed up, and asked her to get Teddy, telling her that he did not know what happened, but that it was bad. Bates asked him if he had beaten Green to death, and he responded that he had not but told her that he had shot his gun and was unaware if he had hurt Green. After several hours and several telephone calls with his family, he turned himself in to the Gilmer police.

Bates admitted that on the night of the murder, she had told the investigating officer that Shepherd had told her that when Green would not take him where he wanted to go, she got out of the car and he went around and shot her. In her statement to the investigator that night, Bates said that Shepherd had told her that Green was giving him all kinds of problems, that he just could not

4

take it anymore, and that Green was dead. Bates also related that Shepherd told her that Green was being short and stupid and not giving him the answers he wanted to hear and that when she got out of the car, he got out and shot her. Bates also testified that when she first learned that Green was dead in the parking lot, her first thought was that Shepherd had finally beaten her to death. She acknowledged that when she talked with Shepherd that night, Shepherd had not expressed any concern for Green, for her, or for his sons, his only apparent concern being that he did not want to get caught.

Connie Ward testified that on that night, she was taking her niece to the car when she first heard a gunshot followed immediately afterward by a terrifying female scream, which lasted until she heard a second gunshot, after which she heard no more screams. After a very short pause following the second gunshot, she heard a third.

Dr. Robert Lyon, a forensic pathologist, testified that Green had been shot three times. He testified that one bullet entered the back of her right shoulder and exited the front of that shoulder. This wound would not have been fatal, Lyon opined, and Green would have been able to scream. Another bullet entered the left side of her face, went through her left lower jaw, and exited the right side of her neck just below the right part of the lower jaw. Lyon testified that the second shot broke her jaw in such a fashion that she would have been unable to scream but would be able to mumble. He also testified that the strippling[4] around the facial wound indicated that she was shot from a distance of one to two feet and that the angle was consistent with a standing shooter and his victim sitting on her buttocks. Lyon testified that the third bullet entered in the back of her

---

[4]Lyon testified that strippling is tiny speck-like scrapes of the skin made by the impact of gunpowder particles.

5

head behind the left ear, traveled to the floor of her skull on the left side and through the cervical spine and spinal cord, killing Green.

Other testimony showed that the Glock pistol had an inner safety and could not be accidentally discharged. Spent shell casings found on the passenger-side windshield wiper and trunk lid of Green's car were identified by April Kendrick, a firearms supervisor at Southwest Institute of Forensic Sciences, as having been fired from Shepherd's pistol. In addition, an unspent cartridge, which she found to have been expelled from Shepherd's pistol, was found near Green's body. Kendrick testified that in order for the unspent cartridge to have been expelled from the pistol, it would have been necessary for someone to manually pull the slide of the pistol rearward.

Dan Reigstad, who had taught at the East Texas Police Academy for thirteen years and also worked with the Longview Police Department for twenty-two years, testified that because of his specialized training and equipment, he had been called to Upshur County to work cases on many occasions and that he was called by the Gilmer Police Department to help in the investigation of Green's death. Reigstad testified that based on his crime scene investigation and the evidence in the case, it appeared that Shepherd had pointed his firearm directly at Green when he shot her in the face. He also testified that the strippling around that facial wound meant that the end of the pistol's muzzle was around two feet away from the face and that shooting someone from this range shows one's intention to shoot that person.

**B.      Green and Shepherd's Relationship**

In addition to evidence surrounding the shooting, the parties offered evidence of the previous relationship of Green and Shepherd. *See* TEX. CODE CRIM. PROC. ANN. art. 38.36(a)

6

(West 2005) (allowing the State and defendant, in prosecutions for murder, to offer relevant testimony of previous relationship between the defendant and deceased). The State first called Melba Baxter, a family law attorney, who testified that Green had consulted her in the fall of 2012 about securing a protective order against Shepherd. Through Baxter, the State introduced a certified copy of an application for protective order she had filed on Green's behalf. Attached to the application was Green's affidavit, which Baxter read to the jury.

In her affidavit, Green averred that she and Shepherd had been involved since 2007 and that they had a son, Teddy, who was then one year old. The affidavit stated that Shepherd had been mentally abusive all of their relationship and physically abusive for most of it. Green's affidavit related an incident that happened on October 7, 2012, in which Shepherd became enraged and, in the presence of Teddy, dragged her from the couch and across the floor by her hair, kicked her in the abdomen, and knocked the breath out of her. The affidavit went on to recount another incident which occurred on October 14, 2012, as they were riding together in Shepherd's truck. At that time, Shepherd made lewd sexual overtures to her, suggested that he and Teddy die together, and told Green that he hated her and would kill her one day. He threatened that if she said anything he did not want to hear, he might do it on the spot. Green stated that Shepherd then pulled her hair and would not let go until she uttered the words, "Baby, I am your bitch and I'll do what you tell me to." Green also related that Shepherd became enraged on October 30, 2012, when he found out that Green's mother was coming over to give Teddy a birthday gift. Shepherd hated Green's mother and, because he heard that she was coming to Green's home, Shepherd (1) threatened to commit physical harm to the mother and (2) stated he was coming to Green's

7

residence to pick up "anything he ha[d] ever paid for including all of [Teddy]'s things" and that he was leaving her for good. Because of Shepherd's threats, Green took Teddy to meet her mother at Wal-Mart, then returned home. Shepherd arrived at Green's residence and, once again, engaged in a fit of anger, throwing a remote control through the front of her television set. Teddy was screaming and Green attempted to call 9-1-1, but Shepherd terminated the call. After the police called back twice, Shepherd turned off her telephone and made Green and Teddy leave the house with him. After about two hours, he took them back home, made her dress up for him, telling her "you're my bitch and you do what daddy says." Green also stated that the next day, Shepherd called to relate a story about a man who killed his wife and fled with his son, telling Green that the story could have been about her. She also averred that she was afraid for her life and that of her son.

Baxter also testified that Green turned over audio recordings to her that corroborated the statements made in her affidavit. The State introduced an audio recording, on which Baxter identified the voices of Green and Shepherd, and a transcript of the recording. This audio recording captured the October 14, 2012 incident which took place in Shepherd's truck as set forth in Green's affidavit.[5]

Shepherd elicited testimony from Bates that she had been friends with Green since junior high school and that their families had taken vacations together. She also testified that Bates had been in a relationship with Shepherd since 1998 and that Bates had her first child by him in 2000.

---

[5]Although Shepherd objected to the admission of the recording, he stated that he had no objection to the admission of the transcript.

Bates testified that her second son with Shepherd was born in 2006. She said that she, Shepherd, and Green began hanging out together when Green moved back to Gilmer, but that their friendship ended about 2009 when she discovered that Green had been sleeping with Shepherd.

Kathy Hegwood testified that she was watching her granddaughter on September 5, 2013, when someone knocked on her door. After she answered the knock, her next-door neighbor, Green, entered her dwelling. Green was weeping, shaking, and apparently frightened and upset and her son, Teddy, was clinging to her leg. Hegwood related that Green told her that Shepherd had broken down her door and that when she tried to call 9-1-1, he took her telephone from her and struck her on the side of her head. Hegwood testified that she called 9-1-1 and that she believed it unsafe for Green to return to the apartment. She testified that while they waited in Hegwood's apartment, Shepherd was looming nearby in his truck. Shepherd would drive off in his truck as if he were leaving the apartment complex, but then circle back around very quietly with his lights extinguished, repeating this routine more than once. On cross-examination, she acknowledged that she was not familiar with Green and Shepherd's relationship and did not see what had happened before Green came to the door.

Officer Racey Turner testified that he responded to the above-mentioned 9-1-1 telephone call and spoke with both Shepherd and Green at Green's apartment. He testified that the apartment doorframe had been damaged consistent with somebody kicking the door open. Photographs of the damaged doorframe taken by Turner were admitted without objection. Turner stated that Green told him that Shepherd had kicked in the door after she took their son inside to hide from him and that after kicking in the door, he began striking her. He also testified that Shepherd told him that

9

Green had kicked in the door, something Turner disbelieved. Although Turner indicated that it appeared to him that Green was crying, upset, and afraid, he also saw no injuries on either Green or Shepherd. He admitted on cross-examination, nevertheless, that he would have been able to arrest Shepherd at that time if he believed that Shepherd had committed an offense.

Sandra Bass Hunter testified that she knew Green for many years because Hunter's daughter and Green were the same age and rented an apartment together at one time. She testified that Green had come to her house around 2:00 p.m. on September 8, 2013, shaking uncontrollably and appearing to be very nervous and terrified. Green told her that she was afraid of Shepherd, who had taken her baby and threatened to kill her. Green asked to stay in one of Hunter's rent houses, and she moved in the next day. Hunter testified that Green had made it clear at that time that she no longer wanted a relationship with Shepherd. She also testified that she saw what appeared to be Shepherd's truck parked across from Green's house for fifteen to twenty minutes on September 25, but that Green was not home.

Jennifer Foster, Green's co-worker, testified that Green told her in the fall of 2012 that she was going to seek assistance from the Women's Center of East Texas. Green also told her that Shepherd had been physically and mentally abusive and that she intended to obtain a restraining order.

## II. Shepherd's Custodial Statement Was Voluntary

In his third point of error, Shepherd asserts that the trial court erred in admitting Shepherd's second custodial statement. He contends that the police engaged in a two-step interrogation

10

process[6] to avoid the requirements of *Miranda*[7] and used deception, thereby rendering his custodial statement involuntary. *See Vasquez v. State*, 411 S.W.3d 918, 919 (Tex. Crim. App. 2013) (citing *Missouri v. Seibert*, 542 U.S. 600, 617 (2004)); *Carter v. State*, 309 S.W.3d 31, 37 (Tex. Crim. App. 2010) (citing *Seibert*, 542 U.S. at 618 (Kennedy, J., concurring)). The State responds that the record supports the trial court's findings that Shepherd was properly informed of his *Miranda* rights, had waived those rights, and that his custodial statement was voluntary. We agree.

### A.      Standard of Review

Texas courts "apply an objective, totality-of-the-circumstances inquiry to determine if the two-step interrogation process was used in a calculated effort to undermine *Miranda*." *Vasquez*, 411 S.W.3d at 919 (citing *Carter*, 309 S.W.3d at 37). Under this standard, we review the trial court's ruling using a bifurcated standard of review, giving almost total deference to the trial court's determination of historical facts that turn on credibility and demeanor while reviewing application-of-law-to-fact issues de novo. *See Carter*, 309 S.W.3d at 40–41 (holding this standard is similar to that set forth in *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002); *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000). This same deference also applies to trial court rulings on application-of-law-to-fact questions, also known as mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at

---

[6]A two-step interrogation process involves a "question first, warn later" approach in which officers deliberately withhold *Miranda* warnings before questioning, then, after incriminating statements are obtained, give the suspect his *Miranda* warnings and ask him to repeat his earlier, unwarned incriminating statements. *See, e.g.*, *Missouri v. Seibert*, 542 U.S. 600, 604–06 (2004).

[7]*Miranda v. Arizona*, 384 U.S. 436, 444 (1996).

11

We review mixed questions of law and fact not falling within this category on a de novo basis. *Id.* An appellate court may not "reverse a trial court's finding of fact simply because it would have decided the question differently." *Carter*, 309 S.W.3d at 41. Rather, we must affirm the decision if it is correct on any theory of law that finds support in the record. *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

Under *Miranda*, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Miranda*, 384 U.S. at 444; *Lampkin v. State*, 470 S.W.3d 876, 891 (Tex. App.—Texarkana 2015, pet. ref'd); *Coffey v. State*, 435 S.W.3d 834, 841 (Tex. App.—Texarkana 2014, pet. ref'd). "Failure to provide the warnings and obtain a waiver prior to custodial questioning generally requires exclusion of statements obtained." *Carter*, 309 S.W.3d at 35–36; *Lampkin*, 470 S.W.3d at 891; *Coffey*, 435 S.W.3d at 841.

Further, the Texas Code of Criminal Procedure mandates that before a written statement of an accused may be introduced into evidence, the face of the statement must demonstrate that the interviewee was provided warnings that

> (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>
> (2) any statement he makes may be used as evidence against him in court;
>
> (3) he has the right to have a lawyer present to advise him prior to and during any questioning;

12

(4)     if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5)     he has the right to terminate the interview at any time . . . .

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a) (West Supp. 2015). Article 38.22 goes on to provide that an oral statement of a defendant given in a custodial interrogation may not be used against the defendant in any criminal proceeding unless, *inter alia*,

(1)     an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement; [and]

(2)     prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning . . . .

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(1), (2) (West Supp. 2015).

Shepherd moved to suppress his statements he had provided to the police. At the suppression hearing, Captain Ron Benge of the Gilmer Police Department testified that after Shepherd turned himself in, he was taken to an office and provided his *Miranda* warnings, both orally and in writing. He testified that Shepherd initialed each warning, understood them, and signed a waiver of his rights. A copy of this written warning was admitted for in-camera inspection. About thirty minutes after Shepherd first signed a statement waiving his *Miranda* rights,[8] Shepherd was taken to an interview room where Benge recorded his first statement. A copy of the videotape of his first statement, admitted for in-camera inspection, shows that Benge asked Shepherd if he had advised him of his rights at 11:40 p.m., and Shepherd affirmed that he

---

[8]Shepherd's written waiver recites that it was signed at 11:40 p.m. on September 26, 2013. Although the videotape of his first statement has a time stamp beginning at 23:23, or 11:23 p.m., on September 26, 2013, Benge is heard at the beginning of the video reciting that the date is September 27, 2013, and the time is 12:13 a.m.

13

had been so advised. Shepherd was shown his written waiver, which he confirmed he had understood and then initialed and signed. Benge testified that Shepherd did not smell of alcohol, that he denied using illegal drugs, and that he did not appear to be impaired during the time he gave either his first or second statement. Benge denied having threatened Shepherd or promised him anything to induce him to make the statements and stated that Shepherd appeared to have been free of stress.

Benge also testified that after concluding the first interview, he interviewed Shepherd a second time on videotape approximately thirty-five minutes after concluding the first statement and also videotaped this interview.[9] He testified, and the videotape shows, that he gave Shepherd his *Miranda* warnings, once again, both orally and in writing; the difference between this second interview and the first one is that the recording of this second interview included the warnings. After Shepherd initialed each warning, the videotape shows he again signed the waiver, which acknowledged that he had read, understood, and waived his rights. Both the signed waiver and the videotape of Shepherd's second statement were admitted at the hearing for in-camera inspection. In his second statement, Shepherd repeated the incriminating statements made in his first statement. On cross-examination, Benge testified that he had been told in the interim that the first oral statement did not comply with the law and would not be admissible because the administration of the *Miranda* warnings had to be included in the video recording. He testified

---

[9]On the videotape of the first statement, Benge recites that it is ending at 1:17 a.m. on September 27, 2013. At the beginning of the second statement, Benge recites that it is beginning at 1:53 a.m. on September 27, 2013.

14

that he did not talk with Shepherd in between the two statements, other than to tell him that he had gotten it wrong and he needed to take his statement again. No other witness testified at the hearing.

At the suppression hearing, the State conceded that the first statement did not comply with Article 38.22 because the recording did not include the administration of the required warnings and stated that this first statement would not be offered as evidence during the guilt/innocence phase of the trial. Rather, the State would only be offering the second statement at trial. In its findings of fact and conclusions of law, the trial court found that *Miranda* warnings were given before the first statement, but were not recorded. It also found that Shepherd understood and waived his rights prior to the first statement. In addition, the trial court found that Shepherd was given his *Miranda* warnings during the second statement, which was recorded. Since Shepherd had been given his *Miranda* warnings and understood and waived these rights before his first statement, the court found under the totality of the circumstances that a two-step process was not used and that although the first statement was inadmissible because of the procedural error, it did not contaminate the admissibility of the second statement.

On appeal, Shepherd concedes that he was given *Miranda* warnings before the first interview. However, he contends that Benge's testimony shows that these warnings were given in conjunction with his arrest. He contends that the absence of questioning contemporaneous with the warnings means that Shepherd would not have understood that those warnings would apply to the subsequent questioning. However, Shepherd does not point to any testimony showing that he did not understand the warnings to apply to the subsequent questioning, nor does he point to any evidence that Shepherd did not read or understand the written warnings. Rather, the record shows

15

that Shepherd initialed each warning and signed a statement acknowledging his understanding and waiver of his rights. Further, on the videotape of his first statement, Shepherd affirms that he had previously been given the warnings, understood them, and waived his rights.[10]

This case is clearly distinguishable from those cases finding a deliberate two-step interrogation strategy. *See Seibert*, 542 U.S. at 604–05 (accused questioned and pressured into making incriminating statements for thirty to forty minutes and given *Miranda* warnings only after making incriminating statements); *Martinez v. State*, 272 S.W.3d 615, 618 (Tex. Crim. App. 2008) (accused questioned, subjected to three- or four-hour polygraph examination, told "failed" polygraph, then given *Miranda* warnings). Here, it is undisputed that Shepherd was given his *Miranda* warnings and waived his rights before any interrogation commenced and before he made any incriminating statements. Although the first video statement may not have met the requirements for admissibility under Article 38.22, it nevertheless satisfied *Miranda*'s requirements. When apprised of his error, Benge again advised Shepherd of his rights in compliance with Article 38.22 before taking Shepherd's second statement. Therefore, we find the record supports the trial court's findings that no two-step interrogation process was used.

In a related argument, Shepherd attacks the trial court's finding that he was not coerced into giving a second statement to the police and that his second statement was freely and voluntarily given. He points to Benge's evasive answer to Shepherd's questioning of the reason for taking a second statement; when asked why the questioning was being repeated, Benge

---

[10]We also note that only thirty minutes elapsed between Shepherd's receipt and waiver of his *Miranda* warnings and his first statement. The Court of Criminal Appeals has previously held that under some circumstances, express written warnings given six to eight hours prior to the incriminating statement satisfies *Miranda*. *Ex parte Bagley*, 509 S.W.2d 332, 337 (Tex. Crim. App. 1974).

16

answered simply, "Well, just because they wanted to." Shepherd argues that since the State told Benge that his first questioning of Shepherd "broke the law," his allegedly false answer tainted the second statement.

In examining the voluntariness of a custodial statement, the trial court "must examine all of the circumstances and the course of police conduct." *Carter*, 309 S.W.3d at 41 (citing *Oregon v. Elstad*, 470 U.S. 298, 318 (1985)). When a motion to suppress is based on the voluntariness of a confession, "the trial court is the 'sole and exclusive trier of fact and judge of the credibility of the witnesses.'" *Id.* at 41–42 (quoting *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007)). As such, we "give great deference 'to the trial judge's decision to admit or exclude such evidence, which will be overturned on appeal only where a flagrant abuse of discretion is shown.'" *Id.* at 42 (quoting *Delao*, 235 S.W.3d at 238). Further, "[t]rickery or deception does not make a statement involuntary unless the method was calculated to produce an untruthful confession or was offensive to due process." *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997) (citing *Dotsey v. State*, 630 S.W.2d 343 (Tex. App.—Austin 1982, no pet.)).

Here, the videotape of the second statement shows that Shepherd made his inquiry in a matter-of-fact manner and was answered in the same way. The videotapes of both the first and second statements portray Benge treating Shepherd courteously and respectfully. In addition, Shepherd's inquiry about the reason for the repeated questioning was made only after he had been given his *Miranda* warnings orally and in writing, he had initialed each warning, and he read and signed his acknowledgment that he understood and waived his rights. While Benge's answer may not have been complete or detailed, the record does not support a conclusion that it was calculated

17

to produce an untruthful confession or that it was offensive to due process. Further, the undisputed evidence is that the second statement contained the same information as the procedurally-deficient first statement. We find that the record supports the trial court's finding that Shepherd's custodial statement was freely and voluntarily given.

Therefore, we find that the trial court did not abuse its discretion in admitting Shepherd's second custodial statement. We overrule this point of error.

## III. Green's Out-of-Court Statements Were Admissible

In his first point of error, Shepherd asserts that the trial court erred in admitting certain out-of-court statements made by Green in violation of his Sixth Amendment right to confront witnesses. *See* U.S. CONST. amend VI. He complains that the trial court made a sua sponte determination of forfeiture by wrongdoing under Article 38.49 of the Texas Code of Criminal Procedure without hearing additional evidence, other than Shepherd's two videotaped statements introduced at the suppression hearing.[11] *See* TEX. CODE CRIM. PROC. ANN. art. 38.49(c) (West Supp. 2015). Shepherd argues, without further explanation, that this determination by the trial

---

[11]At a hearing outside the presence of the jury and after hearing arguments of counsel, the trial court stated, "[L]et me just refresh the memory of Counsel in the courtroom that I have had the opportunity to review the statement made by the defendant and in chambers based on other pretrial motions and under 38.49[,] I make the determination that there was forfeiture by wrongdoing." Shepherd only asserts error under the Confrontation Clause, but nevertheless complains that the trial court did not receive evidence in its hearing outside the presence of the jury. To the extent this can be construed as a separate point of error, we hold that Shepherd has failed to preserve it. To preserve a complaint for our review, a party must first present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling if not apparent from the context. TEX. R. APP. P. 33.1(a)(1). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. TEX. R. APP. P. 33.1(a)(2). Although Shepherd complained in his opening argument at the hearing that no evidence had been heard, he did not object when the trial court pointed out that it had already heard Shepherd's previous statements, nor did he attempt to call any witnesses. Further, he did not object to the trial court's reliance on his statements in making its determination. On this record, we find that Shepherd did not preserve any error related to the trial court's failure to comply with the requirements of Article 38.49.

18

court destroyed his ability to challenge all statements made by Green, whether testimonial or non-testimonial.[12]

### A. Standard of Review

"We review a trial court's decision to admit or exclude evidence for abuse of discretion." *Lund v. State*, 366 S.W.3d 848, 852 (Tex. App.—Texarkana 2012, pet. ref'd) (citing *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002)). A trial court abuses its discretion only when its decision "was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (quoting *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)); *Carter v. State*, 150 S.W.3d 230, 241 (Tex. App.—Texarkana 2004, no pet.). If the trial court's decision is within the zone of reasonable disagreement, it has not abused its discretion, and we defer to that decision. *Lund*, 366 S.W.3d at 852 (citing *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)). If there are no findings of fact, we review the evidence in the light most favorable to the court's ruling and assume the court made findings that are supported by the record. *Carmouche*, 10 S.W.3d at 327–28. Further, we may not substitute our decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Based on our standard of review, we have no choice but to defer to the trial court's discretion on such issues, even if we would have decided them differently. *State v. Herndon*, 215 S.W.3d 901, 907 (Tex. Crim. App. 2007).

---

[12]Shepherd made his initial objection to Baxter testifying regarding the statements made by Green in her affidavit in support of her application for a protective order and to the audio recording of Green and Shepherd in the October 14, 2012, truck incident. The trial court overruled his objections and granted him a running objection under Article 38.49 for Baxter and subsequent witnesses. For testimony offered by other witnesses regarding statements by Green, Shepherd made objections under the Confrontation Clause and Article 38.49, which were overruled. On appeal, Shepherd only asserts error under the Confrontation Clause.

In a criminal prosecution, a defendant has a Sixth Amendment right to be confronted with the witnesses against him. *Giles v. California*, 554 U.S. 353, 357–58 (2008) (citing *Crawford v. Washington*, 541 U.S. 36, 68  (2004)); *Gonzalez v. State*, 195 S.W.3d 114, 116 (Tex. Crim. App. 2006).  Even if a hearsay statement offered against the defendant may be otherwise admissible under the Rules of Evidence, the Confrontation Clause may be implicated if the defendant has not had the opportunity to confront the out-of-court declarant.  *Gonzalez*, 195 S.W.3d at 116; *see Crawford*, 541 U.S. at 68.  However, only testimonial statements implicate, and may be excluded by, the Confrontation Clause.  *Giles*, 554 U.S. at 376.  In addition, the United States Supreme Court has recognized that two forms of testimonial hearsay statements may be admitted even though the defendant has no opportunity to confront the declarant:  declarations made by a declarant who was facing imminent death and was aware he was dying, and declarations made by a declarant whose unavailability the defendant procured.  *Id.* at 358.  The latter exception to the exclusionary effect of the Confrontation Clause is referred to as the doctrine of forfeiture by wrongdoing.

Under forfeiture by wrongdoing, the defendant is barred from asserting his right of confrontation when he has wrongfully procured the unavailability of the witness.  *See id.* at 359–62; *Gonzalez*, 195 S.W.3d at 118–19.  Under *Giles*, this exception applies only "when the defendant engaged in conduct *designed* to prevent the witness from testifying."  *Giles*, 554 U.S. at 359.  Further, the United States Supreme Court requires that there must be some showing by the proponent of the statement that the defendant intended to prevent the witness from testifying.  *Giles*, 554 U.S. at 361–62.  However, forfeiture by wrongdoing applies even when the defendant

20

has multiple reasons for harming the witness, as long as one of the reasons is to prevent her from testifying. *United States v. Jackson*, 706 F.3d 264, 269 (4th Cir. 2013); *United States v. Martinez*, 476 F.3d 961, 966 (D.C. Cir. 2007); *United States v. Houlihan*, 92 F.3d 1271, 1279 (1st Cir. 1996). Forfeiture by wrongdoing may apply "even though the act with which the accused is charged is the same as the one by which he allegedly rendered the witness unavailable." *Gonzalez*, 195 S.W.3d at 125; *see also Giles*, 554 U.S. at 374 n.6, 377.

Similarly, Article 38.49 requires the trial court to make a determination, outside the presence of the jury, "whether forfeiture by wrongdoing occurred by a preponderance of the evidence." TEX. CODE CRIM. PROC. ANN. art. 38.49(c). The statute also provides that the evidence to be considered by the trial court in its determination of forfeiture by wrongdoing is "[e]vidence and statements related to a party that has engaged or acquiesced in wrongdoing that was *intended* to, and did, procure the unavailability of a witness or prospective witness." TEX. CODE CRIM. PROC. ANN. art. 38.49(b) (emphasis added). In addition, the statute provides that the party offering the evidence is not required to show that the wrongdoer's "sole intent was to wrongfully cause the witness's or prospective witness's unavailability." TEX. CODE CRIM. PROC. ANN. art. 38.49(d)(1). Thus, the requirements of Article 38.49 substantially correspond with the requirements for forfeiture by wrongdoing set out in *Giles*.

### B.    Analysis

In a pre-*Giles* case, the Court of Criminal Appeals considered whether the statements of one of the appellant's deceased victims were admissible under the forfeiture by wrongdoing exception to the Confrontation Clause. *Gonzalez*, 195 S.W.3d at 114–15. Officers responding to

21

a 9-1-1 call found Maria and Baldonero Herrera in their home, dying of gunshot wounds. Maria excitedly told officers that the person who shot them was an approximately eighteen-year-old Hispanic male with blondish-colored hair. *Id.* at 115. She further stated that the shooter was related to the people who lived across the street in a rock house and that he had taken their truck. *Id.* Police later apprehended Gonzalez in the Herreras' truck, and he was charged with capital murder. *Id*. 115–16. At a pretrial hearing, the trial court determined that Maria's statements were admissible as excited utterances, over Gonzalez' hearsay and Confrontation Clause objections. *Id*. at 116. On appeal, the Court of Criminal Appeals considered Gonzalez' Confrontation Clause claim. *Id*. After discussing the forfeiture by wrongdoing doctrine, the court noted that at that time, application of the doctrine for the majority of the courts required that the defendant's misconduct caused the unavailability of the witness and that some courts required that the defendant acted with the intent to prevent the witness from testifying. *Id*. at 123. Without deciding whether a showing of intent was required, the court found that the record "support[ed] the inference that [Gonzalez] shot the Herreras to silence them." *Id*. at 125. The court reasoned that the Herreras, who lived across the street from Gonzalez' grandmother, knew him, that he came into their house undisguised and with the distinguishing characteristic of his dyed, blond hair, that he shot to kill, and that both victims were left for dead. *Id*. The court noted that a logical inference was that Gonzalez "killed the Herreras because he wanted to steal their truck and their money, and he didn't want any witnesses to his crime." *Id*.

In this case, the trial court found that there was a forfeiture by wrongdoing on the part of Shepherd. Implicit in this finding was a finding that by a preponderance of the evidence, Shepherd

engaged in wrongdoing that he intended to (and that did) procure the unavailability of Green as a witness or prospective witness. As Shepherd concedes, the evidence relied upon by the trial court was the two statements he gave to the police. As seen above, in his second statement, Shepherd stated that when Green refused to take him to the emergency room and attempted to call his wife, he drew his pistol, leaned over the seat to show her the pistol, and ordered her to "just go." He refused to put the pistol away when she begged him to and when she got out of the car to flee, he said that he shot in her general direction. He said that he then got out of the back seat of her car and went around the car to the place Green was sitting on the ground screaming. In his first statement, he revealed that at this time, he thought, "[W]hat the crap, I got this gun out and somebody [sic] see it, you know, this don't look good, and I walked around and she lying on the ground." In his second statement, he says that she was screaming and crying, so he discharged his pistol in her direction at least one more time, and the screaming stopped. After this, he fled in his truck.

Viewed in the light most favorable to the trial court's ruling, this evidence supports an inference that a part of the reason that Shepherd shot Green was to prevent her from testifying against him. Shepherd attempted to kidnap Green. When she attempted to call his wife, Shepherd threatened her with his loaded pistol. When Green attempted to escape, he shot her. Realizing that she was still alive and screaming, he went around the car and silenced her by shooting her until she was dead, after which he fled the scene. We find that it is within the zone of reasonable disagreement that the trial court could infer from this evidence that when Shepherd shot Green, he was motivated (at least partially) by his desire to prevent her from testifying against him.

23

Therefore, the trial court did not abuse its discretion in finding forfeiture by wrongdoing and admitting any testimonial hearsay statements of Green. We overrule this point of error.[13]

## IV.   No Instruction on the Lesser-Included Offense of Felony Murder Was Warranted

In his second point of error, Shepherd complains that the trial court erred in refusing to submit a lesser-included offense of felony murder instruction in the jury charge.[14] *See* TEX. PENAL CODE ANN. § 19.02(b)(3) (West 2011). He argues that since felony murder is a lesser-included offense of capital murder, his assertions in his second statement that he never meant to hit Green when he fired his pistol, that he fired in her direction, but could not say he pointed the gun at her, and that he did not mean for any of this to happen, are some evidence that he did not intend to kill Green. This, he argues, entitled him to a lesser-included offense instruction of felony murder. The State argues that a review of all of the evidence shows that Shepherd intended to both kidnap Green and to murder her. We agree.

### A.   Standard of Review

Our review of alleged jury charge error involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *Thomas v. State*, 454 S.W.3d 660, 664 (Tex. App.—Texarkana 2014, pet. ref'd). Initially, we determine whether an error occurred and then, if so, we

---

[13]In a subpoint under this point of error, Shepherd complains that Article 38.49 is unconstitutional, as applied to him, since its application denied him his right to confront witnesses. However, Shepherd does not cite to any place in the record, and we have found none, where he made an objection or motion in the trial court complaining that Article 38.49 was unconstitutional as applied to him. *See* TEX. R. APP. P. 33.1(a). Failure to make a specific, timely objection or motion that a statute is unconstitutional as applied preserves nothing for our review. *See Freeman v. State*, 340 S.W.3d 717, 730 (Tex. Crim. App. 2011); *Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995); *Williams v. State*, 305 S.W.3d 886, 893 (Tex. App.—Texarkana 2010, no pet.).

[14]The lesser-included offense of murder was submitted in the jury charge. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011).

24

determine whether the error was sufficiently harmful to require reversal. *Abdnor*, 871 S.W.2d. at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), *reaff'd by Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).

Our review of whether an instruction on a lesser-included offense should be given also involves a two-step determination. *See Cavazos v. State*, 382 S.W.3d 377, 382–83 (Tex. Crim. App. 2012); *Feldman v. State*, 71 S.W.3d 738, 750 (Tex. Crim. App. 2002); *Carson v. State*, 422 S.W.3d 733, 746 (Tex. App.—Texarkana 2013, pet. ref'd). First, we determine whether "the proof necessary to establish the charged offense also includes the lesser offense." *Cavazos*, 382 S.W.3d at 382 (citing *Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007)); *Feldman*, 71 S.W.3d at 750; *Carson*, 422 S.W.3d at 746. If it does, then we determine "whether there is some evidence that would permit a rational jury to find that, if the [defendant] is guilty, he is guilty only of the lesser offense." *Cavazos*, 382 S.W.3d at 383 (citing *Hall*, 225 S.W.3d at 536); *Feldman*, 71 S.W.3d at 750; *Carson*, 422 S.W.3d at 746. This second inquiry is a fact question based on the evidence admitted at trial and requires that there be some evidence that would allow a rational jury to acquit the defendant of the greater charge and convict him of the lesser-included offense. *Cavazos*, 382 S.W.3d at 383; *Feldman*, 71 S.W.3d at 750–51. The instruction must be given if there is evidence from any source, regardless of whether it is weak, impeached, or contradicted, that raises a fact issue of whether he is guilty *only* of the lesser offense. *Cavazos*, 382 S.W.3d at 383; *Carson*, 422 S.W.3d at 746. To determine whether there is some evidence raising an issue, we consider it in the context of the entire record. *Carson*, 422 S.W.3d at 746–47; *see Cavazos*, 382 S.W.3d at 384–85.

**B.      Analysis**

It is undisputed that felony murder is a lesser-included offense of capital murder. *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993). "Capital murder requires the existence of an 'intentional cause of death.'" *Rousseau*, 855 S.W.2d at 673 (quoting *Creel v. State*, 754 S.W.2d 205, 211 (Tex. Crim. App. 1988)). For felony murder, however, the Legislature has omitted any culpable mental state. *Lomax v. State*, 233 S.W.3d 302, 304 (Tex. Crim. App. 2007). Rather, the felony murder statute only requires that the defendant "commits . . . an act clearly dangerous to human life that causes the death of an individual" while committing or attempting to commit a felony (other than manslaughter), or in immediate flight from committing or attempting to commit the felony. TEX. PENAL CODE ANN. §19.02(b)(3). Thus, the felony murder statute "make[s] a person guilty of an 'unintentional' murder when he causes another person's death during the commission of some type of a felony." *See Lomax*, 233 S.W.3d at 305.

Therefore, under the second prong, the relevant inquiry is whether there is some evidence that would allow a jury to rationally find that Shepherd had the intent to kidnap Green, but that he did not intend to cause her death. *See Salinas*, 163 S.W.3d at 742; *Rousseau*, 855 S.W.2d at 673. The evidence may show that Shepherd is guilty only of the lesser offense if either (1) the evidence "refutes or negates other evidence establishing the greater offense" or (2) the evidence of Shepherd's intent "may be subject to two different interpretations." *Cavazos*, 382 S.W.3d at 385; *Carson*, 422 S.W.3d at 747. Our review of the evidence is guided by the Court of Criminal Appeals' direction that "there must be some affirmative evidence that [the defendant] did not

26

intend to cause [the death of Green] when he shot [her]." *Cavazos*, 382 S.W.3d at 385. It is further guided by that court's explanation that even though "anything more than a scintilla of evidence may be sufficient to entitle a defendant to a charge on a lesser offense," still "the evidence produced must be sufficient to establish the lesser-included offense as a 'valid, rational alternative' to the charged offense." *Id.* (quoting *Hall*, 225 S.W.3d at 536). Thus, the evidence must "be directly germane to the lesser-included offense and must rise to a level that a rational jury could find that if [the defendant] is guilty, he is guilty only of the lesser-included offense." *Id.*

Shepherd argues that his second statement supplies some evidence that he did not intend to kill Green. He points to the following claims he made in his statement:

(1)     that he fired a shot but never meant to hit her, his sole motive being to get her attention;

(2)     that upon exiting the vehicle he pointed his gun in Green's direction, but could not say for certain that he pointed it directly at her;

(3)     that he discharged his firearm but did not know if he hurt her or not; and

(4)     that he did not mean for any of this to happen.

Shepherd argues that these statements are clearly consistent with an unintentional killing. However, Shepherd does not place these claims either in the context of his own statement or of the remainder of the evidence. He stated that he never meant to hit Green, only to get her attention, when he was telling of Green's attempted escape and his shooting her to prevent the same. Shepherd's own statement shows that this shot was not fatal, rather he stated that afterward, she was sitting on the ground, screaming. Shepherd goes on to state that he then exited the vehicle and went around Green's car to where she was sitting and, from close range, shot her at least one

27

more time, until she stopped screaming and laid on the ground. Then he fled. Other evidence showed that the initial shot was to her shoulder and was not fatal, but would allow her to scream. A second shot was discharged into her face at a range of one to two feet, was also not fatal, but would have prevented her from screaming by breaking her jaw. The final, fatal shot was to the back of her head. The evidence also showed that Shepherd manually expelled an unspent cartridge, found near Green's body, sometime between the first and third shots.

In *Cavazos* the Court of Criminal Appeals found that "[p]ulling out a gun, pointing it at someone, pulling the trigger twice, fleeing the scene . . . , and later telling a friend 'I didn't mean to shoot anyone' does not rationally support an inference that Appellant acted recklessly at the moment he fired the shots" and would not convince a rational jury that he was guilty only of a lesser-included offense. *Id*. In this case, while the evidence may support an inference that the first shot was accidental, the evidence shows that the shot to Green's face from close range and the fatal shot to the back of her head were intentional. As in *Cavazos*, the evidence would not support an inference that Shepherd did not intend to kill Green, and it would not allow a rational jury to find that if he was guilty, he was guilty only of felony murder.

Therefore, we hold that the trial court did not err in refusing to instruct the jury on the lesser-included offense of felony murder. We overrule this point of error.

## V.    Conclusion

We affirm the judgment of the trial court.

Bailey C. Moseley
Justice

Date Submitted:    March 18, 2016
Date Decided:    April 15, 2016

Publish