**Opinion issued December 28, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00076-CR

————————————

**BRIAN KENNETH BULLOCK, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Case No. 1610898**

---

## MEMORANDUM O P I N I O N

A jury convicted Brian Kenneth Bullock of capital murder, and the trial

court assessed his punishment at life imprisonment without the possibility of

parole. TEX. PENAL CODE § 19.03(a)(7) (stating person commits capital murder if

he murders more than one person during same criminal transaction); TEX. PENAL

CODE § 12.31(a)(2) (stating the punishment for capital murder is life imprisonment without parole or death). On appeal he argues that the trial court reversibly erred by admitting a recording containing statements of one of the decedents. Bullock contends that the trial court abused its discretion by finding, under the doctrine of forfeiture by wrongdoing, that he had forfeited his right to confront the witness. He also argues that the judgment should be modified to reflect that the court, rather than the jury, assessed his punishment. We modify the judgment to reflect that the court assessed punishment and affirm the judgment as modified.

## Background

In early November 2018, Bullock used a tactical knife to stab and slash Michelle Bullock and Mark Kiel to death. Bullock had been married to Michelle for six years, and they had three small children. By 2018, they were not living together and were estranged, but Bullock had hoped to reconcile with Michelle.

At trial, the jury heard from Michelle's friends, Bullock's mother, and law enforcement officials. A detective captured and reviewed communication between Bullock and Michelle from June 2018 until November 2018. He testified that he had reviewed thousands of email and text communications by and between Michelle and Bullock. The detective had also reviewed Michelle's Facebook account and messages. Many of these communications were admitted into evidence.

2

The communication between Michelle and Bullock established that Bullock had been physically abusive toward Michelle. In 2015, Bullock kicked and stomped Michelle, leaving noticeable bruises. In June 2018, Michelle moved out of Bullock's mother's home after Bullock assaulted her there. A few days after the assault, Michelle called 911 to report it. Bullock was charged with assault as a result, and that charge was pending at the time of the murders. Between June and November, Bullock constantly contacted Michelle. Michelle stated that she wanted a divorce, and by November, she rented her own housing in Tomball.

Bullock was emotionally abusive. The email communication showed Bullock's threats and harassment. Neither side disputes that Michelle was a sex worker. The communications show that Bullock regularly threatened Michelle about it. In one email, he threatened to report Michelle's sex work, and he said, "I'm willing to go to the scene of the crash; how about you prostitute?"

In the month preceding Michelle's death, Bullock confronted her at a bar. Michelle's friend, who was there, testified that Bullock told Michelle that he was tired of her embarrassing him. He told Michelle that her time was running out or "almost up." When Michelle asked why he was there, he responded that her clock was ticking. He then put his beer down on a bar so hard that some of it spilled out of the glass, and he left. Michelle and her friend left the bar, and the friend stayed with Michelle for the rest of the evening because Michelle did not feel safe.

3

A week before the murders, Bullock warned Michelle: "I don't think you understand how much effort it takes for me to stay reasonably calm." Three days before the murder, Bullock messaged Michelle: "Somebody has to go for broke. Guess I'm that guy. Goodluck whore."

Leading up to the weekend of November 4, 2018, Michelle was concerned for her safety. Bullock's father had warned Michelle that Bullock was coming to the Houston area from Dallas. A friend testified that she was in communication with Michelle throughout the weekend and had worked out a safety plan with her. Michelle told her landlord to look out for Bullock. She attempted to hide by getting a hotel room and leaving her car in a parking lot away from her home. Initially, Bullock did not know where Michelle lived, but by the end of the weekend, he found her.

Bullock arrived at Michelle's home unannounced when Michelle was there. He was upset and wanted to confront her. He had previously told Michelle that he did not like seeing her with other men. Mark Kiel was at Michelle's house. Kiel was a handyman, and there was evidence from their communications that he was "exchanging services" with Michelle. Bullock stabbed or slashed Kiel seventeen times. He stabbed or slashed Michelle eight times. Both Michelle and Kiel were stabbed in the throat. Both tried to flee, but they died on the walkway outside Michelle's house.

After stabbing Mark and Michelle, Bullock cleaned himself up inside the house. He then used his phone to call 911 and report the stabbing. He did not reference being attacked by Michelle in the call. Bullock drove to a police station and surrendered. On the way to the police station, Bullock's phone "accidentally flew out the window" and was never recovered. Bullock testified that he did not know where it was.

At trial, Bullock did not dispute that he used a knife to kill Michelle and Mark. He argued instead that he did so in self-defense. He testified that Mark and Michelle ambushed him, and that Mark was going to use a boxcutter to attack him.

The jury found Bullock guilty of capital murder. The trial court assessed his punishment at life imprisonment.

## Forfeiture by Wrongdoing

On appeal, Bullock contends that the trial court abused its discretion in finding that he wrongfully procured the unavailability of a witness and admitting a recording of Michelle's 911 call though she was unavailable to testify. He argues that admitting the evidence violated his Sixth Amendment right to confront the witnesses against him and that the evidence was hearsay. We disagree.

### A.    Standard of Review

A defendant in a criminal prosecution has a Sixth Amendment right to be confronted with the witnesses against him. *Crawford v. Washington*, 541 U.S. 36,

5

68–69 (2004); *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App. 2015). Under the Confrontation Clause, "testimonial" statements, those made under circumstances that would lead an objective witness to reasonably believe they would be available for use at a later trial, are inadmissible at trial unless the witness who made them either takes the stand to be cross examined or is unavailable and the defendant had a prior opportunity to cross examine the witness. *Paredes*, 462 S.W.3d at 514.

Relevant to this appeal, an exception to this principle is the forfeiture by wrongdoing doctrine, which provides that a defendant is estopped from asserting his right to confrontation when he has wrongfully procured the unavailability of the witness. *Giles v. California*, 554 U.S. 353, 359 (2008); *Davis v. Washington*, 547 U.S. 813, 833 (2006) (reasoning that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation"); *Brown v. State*, 618 S.W.3d 352, 355 (Tex. Crim. App. 2021) (stating forfeiture by wrongdoing exempts statement from restrictions of Confrontation Clause). The doctrine of forfeiture by wrongdoing is based on the principle that tampering with a witness "should . . . estop the tamperer from making any objection based on the results of his own chicanery." *Colone v. State*, 573 S.W.3d 249, 264–65 (Tex. Crim. App. 2019) (quotation omitted).

Article 38.49 of the Texas Code of Criminal Procedure codifies the forfeiture by wrongdoing doctrine. *Brown*, 618 S.W.3d at 355. It states that a party who wrongfully procures the unavailability of a witness forfeits the right to object to the admissibility of evidence based on that unavailability. TEX. CODE CRIM. PROC. art. 38.49(a)(2). The exception applies only "when the defendant engaged in conduct *designed* to prevent the witness from testifying." *Giles*, 554 U.S. at 359 (emphasis in original). In addition, the party putting forth the evidence, in this case the State, must prove that the defendant intended to prevent the witness from testifying. *Id.* at 361–62. The State is not required to show that the actor's sole intent was to wrongfully cause the witness's unavailability. TEX. CODE CRIM. PROC. art. 38.49 (d)(1).

Because the forfeiture by wrongdoing doctrine concerns the admission of otherwise inadmissible evidence, we review a trial court's admission of evidence under the doctrine for an abuse of discretion. *Shepherd v. State*, 489 S.W.3d 559, 572 (Tex. App.—Texarkana 2016, pet. ref'd). We will uphold the trial court's ruling if there is some evidence to support the trial court's decision and it is correct under any theory of law applicable to the case. *Armendariz v. State*, 123 S.W.3d 401, 405 (Tex. Crim. App. 2003) (stating appellate courts must uphold evidentiary rulings if they are correct under any theory of law supported by record regardless of what reason trial court gives); *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim.

App. 2002) (stating trial court does not abuse its discretion by admitting evidence if there is some evidence to support trial court's decision). When assessing evidence regarding acts alleged to have procured a witness's unavailability, we draw all reasonable inferences in favor of the trial court's ruling. *See Brown*, 618 S.W.3d at 357.

## B.    Article 38.49 hearing

The State sought to admit a recording of a 911 call by Michelle reporting the June 2018 assault. On the call, Michelle states that two days prior, she had returned home with her two-year-old to Bullock, and Bullock was mad that she had been gone for three hours. He became violent and wanted her phone. He chased her into the street where he ripped her shirt off and tried to grab her. When Michelle returned to the house, he followed her inside and threw her against the wall. Michelle described the bruises on her body for the operator. She confirmed that the incident happened two days earlier, and that Bullock's mother was present at the time of the assault. She told the operator that she had waited to call until after Bullock left town and that he was in Massachusetts. The operator took biographical information and confirmed that Michelle did not need an ambulance. The operator told Michelle that an officer would be sent out to speak with her. Bullock was charged with misdemeanor assault.

8

At the hearing regarding admission of the 911 call, the State argued that the statements in the 911 call were admissible because Bullock procured Michelle's unavailability to testify in the assault case by murdering her. The State argued that the abusive nature of their relationship was reflected in their email communication and Michelle's text and Facebook messages.

Bullock responded that he had no reason to make Michelle unavailable because Michelle had indicated that she had no intention to testify against him. As evidence, Bullock pointed to an email where he notified Michelle of a court date in the pending assault case, and she responded that she had no intention of testifying. He argued that he did not tell her to lie, and she did not indicate that she had fears of testifying. He also mentioned that after the charge brought against him, he traveled with Michelle to Puerto Rico and continued a sexual relationship with her. He maintained that the act of killing Michelle was self-defense, not done to prevent her from testifying. The State responded by pointing to the history of abuse shown in the email communication between Michelle and Bullock. The State argued that the abusive relationship between them ended in murder, it urged the trial court to consider the history of domestic violence when determining Bullock's intent to procure Michelle's unavailability. The trial court agreed with the State and found there was sufficient evidence to show that Bullock intended to make Michelle unavailable to testify against him.

**C.     Analysis**

The parties agree that Michelle's statements during the 911 call were testimonial. They disagree as to whether the trial court heard sufficient evidence to conclude that at least some of Bullock's intent in killing Michelle was to make her unavailable or prevent her from testifying in the pending assault matter against him.

The record includes some evidence that Bullock wrongfully procured Michelle's unavailability to testify against him in the pending assault case by murdering her. The record includes numerous emails and text messages between Bullock and Michelle from June to November 2018. Those emails demonstrate the abusive dynamics of Bullock's relationship with Michelle and Bullock's attempts at manipulating her.

In June preceding her death, Michelle reported that Bullock assaulted her, leading to a pending charge against Bullock for family violence. Michelle separated from Bullock. Between that time and her death, Bullock sought to reconcile with her. They were in regular communication by email, with Bullock often emailing Michelle repeatedly throughout the day and night. The record reflects evidence of an abusive cycle in their communications. Often the subject of the same email chain changes from everyday issues, like coparenting and insurance, to Bullock threatening and harassing Michelle.

10

The evidence shows Bullock regularly berated Michelle for her work as a sex worker, calling her names in their communications. Bullock regularly threatened Michelle about her probation.* After Michelle called the police to report the assault in June, Bullock reminded Michelle that she is on probation and threatened that unless she drops the charges, she will go to prison. He condemned her for "play[ing] a victim" and victimizing him. He blamed her and claimed that she was ruining his life. Bullock threatened Michelle in August 2018, stating "good luck with lying" and that he was sure her parole officer would find her convincing.

The record reflects Michelle's attempts to keep the peace with Bullock. When Bullock brings up that Michelle stayed with him after the assault and had sex with him, Michelle responds that she did so "because otherwise you wouldn't have left." She told her friend that she had to "keep being nice" to Bullock because she was on probation. She limited her interactions with Bullock. In the months before the murder, she maintained that they were separated, and she wanted to divorce him. Though he emailed her multiple times a day and through the night, Michelle's responses were curt. Bullock, unhappy with Michelle's limited

---

* Michelle was on probation for child endangerment. She often communicated to Bullock that she had changed since her conviction and was working on bettering herself. Some of her friends testified at trial that they had met her as part of a local Alcoholics Anonymous group.

11

responses, described them in an email as "me saying something and you going 'LOL blah blah.'"

In the weeks leading up to her murder, Bullock's communication with Michelle included more physical threats. A week before the murder, he wrote, "I don't think you understand how much effort it takes for me to stay reasonably calm." Three days before the murders, Bullock wrote Michelle: "Somebody has to go for broke. Guess I'm that guy. Goodluck whore." Just weeks before her death, Bullock confronted Michelle at a bar and threatened to send her to prison.

On appeal, Bullock argues that Michelle was not concerned about testifying, therefore he could not have been motivated to make her unavailable. Bullock relies on an email message from Michelle on October 18, 2018. In the email, Michelle tells him that she will not be testifying against him in the assault case.

The State argues that the nature of the abusive relationship between Bullock and Michelle cautions against taking her statements in a single email as indicative that she would not be testifying. The State points out that many times Michelle seems to be attempting to placate Bullock to prevent him from lashing out at her. The State also argues that it is not necessary for Bullock to be fully motivated to procure Michelle's absence to prevent her from testifying. Instead, the State argues that it was reasonable for the trial court to believe, considering Bullock's relationship with Michelle and the pending assault charge against him at the time,

that Bullock was at least partially motivated by an intent to make Michelle unavailable to testify against him.

Appellate courts must affirm an evidentiary ruling if the ruling is supported by the record and correct under any theory of law applicable to the case. *See Armendariz,* 123 S.W.3d at 405. The evidence, viewed in the light most favorable to the trial court's ruling, supports an inference that part of the reason that Bullock stabbed Michelle to death was to prevent her from testifying against him. *Shepherd*, 489 S.W.3d at 575 (upholding trial court's ruling that defendant made witness unavailable by shooting her); *see also Dominguez v. State*, No. 05-20-00968-CR, 2022 WL 3024330, at *5 (Tex. App.—Dallas July 29, 2022, no pet.) (mem. op.) (holding trial court did not err in upholding forfeiture by wrongdoing finding when evidence showed witness, who was in relationship with defendant, was afraid of defendant and defendant had repeatedly threatened and abused her). The trial court's decision to overrule Bullock's Confrontation Clause and hearsay objections to the admission of the 911 call recording was correct because the out–of–court statements were made by Michelle, the witness whose unavailability Bullock wrongfully procured. The trial court did not abuse its discretion by concluding that the State showed by a preponderance of the evidence that Bullock wrongfully procured Michelle's unavailability at trial. Accordingly, the trial court

did not abuse its discretion by admitting Michelle's out-of-court statement in the 911 call. We overrule Bullock's first issue.

## Correction of Judgment

In his second issue, Bullock claims that the judgment incorrectly reflects that his punishment was assessed by the jury instead of the trial court. The State agrees that the judgment should reflect that punishment was assessed by the trial court.

This court has the power to modify an incorrect judgment to make the record speak the truth when we have the necessary information to do so. TEX. R. APP. P. 43.2(b); *Cazarez v. State*, 606 S.W.3d 549, 557–58 (Tex. App.—Houston [1st Dist.] 2020, no pet.). Bullock was convicted of capital murder, which results in an automatic sentence of life without parole. TEX. PENAL CODE § 12.31(a)(2). The trial court assessed the punishment. We agree that the judgment should be corrected to reflect that punishment was assessed by the court, rather than the jury.

## Conclusion

We modify the judgment to reflect that punishment was assessed by the court, and we affirm the judgment as modified.

Peter Kelly
Justice

Panel consists of Justices Kelly, Hightower, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).

14