

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-17-00244-CR

———————————————

ARTUR SIGALAVILLAVICENCIO, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 4
Tarrant County, Texas
Trial Court No. 1451344D

Before Kerr, Pittman, and Birdwell, JJ.
Memorandum Opinion by Justice Pittman

## MEMORANDUM OPINION

A jury convicted Appellant Artur Sigalavillavicencio[1] of the Christmas 2015 murder of M.C., the mother of his three children, and the trial court sentenced him to fifty years' confinement. In three issues, Appellant challenges the admission of hearsay evidence that he claims is not subject to the Article 38.49 exception of the Texas Code of Criminal Procedure (Issue One) and the constitutionality of that statute (Issue Two) and contends that his trial counsel was ineffective by failing to challenge the State's expert witness on domestic violence and by failing to object to her testimony "quantifying the lethality risk" Appellant posed to M.C. (Issue Three). Because Appellant did not preserve his constitutional and evidentiary complaints or satisfy his burden to prove ineffective assistance of his trial counsel, we affirm the trial court's judgment.

---

[1]In a typed, pro se motion received but not filed by this court, Appellant, who was then and is now represented by appointed appellate counsel, contends that the correct spelling of his surname is *Sigalavillavincencio*. Conversely, in a handwritten motion in the same mailed packet, also received but not filed, he contends that the correct spelling is *Sigalavillavicencio*, the name used in the trial court's judgment, the notice of appeal, and this opinion. The court takes no action on any of Appellant's pro se motions. *See Patrick v. State*, 906 S.W.2d 481, 498 (Tex. Crim. App. 1995) ("[A]ppellant is not entitled to hybrid representation.").

## BACKGROUND FACTS

Appellant and M.C. had been together since 2011, but there had been multiple incidents of domestic violence throughout their relationship. The jury heard evidence that:

- In 2011, Appellant, who "[s]ometimes . . . d[id]n't want [M.C.] to go to work," took the pickup she had borrowed from a family member and parked it on some railroad tracks. It was unusable by the time it was found;

- After that incident, M.C.'s sister (Sister) went to help M.C. move out of Appellant's parents' home with her baby, and Appellant shot at Sister, who was outside her car, and at the car containing M.C. and the baby;

- In 2013, Appellant cut M.C.'s neck and threw her against a wall; and

- In 2014, Appellant beat M.C., attempted to rape her, and choked her until she lost consciousness; she was seven months' pregnant.

M.C.'s home sat between Sister's home and the home of their brother (Brother). On December 24, 2015, M.C. and her two young daughters went next door to Sister's home to celebrate.[2] Appellant sat in his van outside of M.C.'s house. M.C. called him and invited him to join the party, but he refused. She had to work the next morning, so she and her daughters went home sometime after midnight but before 1:00 a.m.

A.S., M.C.'s teenaged niece, helped M.C. and her children take their presents back to M.C.'s house. The door to the house was locked, however, so M.C. asked

---

[2]M.C.'s son was in Mexico with his grandparents.

3

A.S. to put the presents inside M.C.'s truck, and then M.C. began talking on her cell phone to Appellant. A.S. testified that as she returned to her own house to retrieve the rest of M.C.'s family's presents, Appellant arrived at M.C.'s house driving fast and playing his music loud. When A.S. returned to M.C.'s house with the remaining presents, M.C. and her daughters were inside, and Appellant was in his van. The older daughter, who was four years old, told A.S. that Appellant had a gun. A.S. told the child to go to her room, M.C. told A.S. she could leave, and A.S. left.

Sometime after M.C. left Sister's home, Brother heard a gunshot. Wanting to join in what he thought was celebratory gunfire, Brother got his gun, went outside, and fired off some shots. Appellant then came out of M.C.'s house holding a small gun and looking scared. He confronted Brother, complaining that the gunfire would bring the police. Brother told him that if the police came, he would take responsibility for the gunfire. Appellant got in his van and left, briefly returned to the house, and then sped off again.

At around 3:40 a.m. while he was at M.C.'s, Appellant called 911 and stated that:

- His wife (M.C.) had called him to report that a .25 caliber gun had gone off accidentally, shooting her in the breast;

- He had the gun (which he later denied in the same conversation);

- He was not at her house, the address of which he reported, but she was; and

- He was coming from his cousin's house.

4

The MedStar dispatcher notified Appellant that he knew the call was coming from the reported address of the shooting.

A few minutes after Appellant sped away from M.C.'s house, the police arrived. M.C. was on her bed, dead of a gunshot wound to the chest. Her sleeping baby and four-year-old were on the bed with her.

No gun or shell casing was found in the house. One of Brother's casings was found in the street, but it did not match the bullet retrieved from M.C.'s body. Instead, the police found the gun that fired that bullet in Appellant's bedroom at his parents' house.

Appellant fled to Mexico and surrendered a few months later to authorities in the United States.

Appellant does not challenge the sufficiency of the evidence, and in his opening statement, his trial counsel stated that "there's no doubt that [Appellant was] holding a gun that went off and struck and killed [M.C.]" and conceded that the couple had "a stormy past."

## DISCUSSION

I.   **Appellant Did Not Preserve His Constitutional Complaint.**

In his second issue, Appellant contends that Article 38.49 of the Texas Code of Criminal Procedure violates his rights to due process under the Sixth and Fourteenth Amendments to the United States Constitution because it undercuts his rights of confrontation. *See* Tex. Code Crim. Proc. Ann. art. 38.49. A challenge to the

5

constitutionality of a statute must be raised in the trial court to be preserved for appellate review. *Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009) (holding that a facial challenge to the constitutionality of a statute cannot be raised for the first time on appeal); *Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995) (holding as-applied issues forfeited because not raised in the trial court); *Shepherd v. State*, 489 S.W.3d 559, 575 n.13 (Tex. App.—Texarkana 2016, pet. ref'd) (holding an as-applied constitutional challenge to Article 38.49 forfeited because the defendant did not raise it in the trial court); *see* Tex. R. App. P. 33.1(a). A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009). Appellant does not refer us to any place in the record where he raised this complaint in the trial court, nor has our own review of the record shown that he first raised it in the trial court. Accordingly, we overrule Appellant's second issue.

## II. Appellant Did Not Preserve His Hearsay Complaints About State's Exhibit 126 or About the Testimony of Its Contents by Detective Russell and Kathryn Jacob.

In a pretrial hearing, the trial court found that some evidence should be admitted under the doctrine of forfeiture by wrongdoing as described in Article 38.49 of the Texas Code of Criminal Procedure but did not find that all the evidence the State proffered on that ground should be admitted under that doctrine. In his first issue, Appellant challenges the admission of State's Exhibit 126—a Fort Worth Police Department family violence packet completed after Appellant's alleged

6

2014 assault of M.C. and including statements from M.C. (family violence packet)—as well as related testimony by Fort Worth Police Detective Marcus Russell and SafeHaven President Kathryn Jacob because they were or contained hearsay statements not expressly included in the trial court's ruling admitting evidence under the doctrine. The trial court made no express pretrial ruling on the admissibility of the evidence Appellant challenges.

A.    **Appellant Does Not Challenge the Trial Court's Ruling that He Committed Forfeiture by Wrongdoing and Does Not Raise Confrontation Complaints to the Evidence He Challenges.**

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; see also *Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 1359 (2004). Under the doctrine of forfeiture by wrongdoing, a defendant is barred from asserting his right of confrontation when he has wrongfully procured the unavailability of the witness. *Giles v. California*, 554 U.S. 353, 359–62, 128 S. Ct. 2678, 2683–84 (2008); *Gonzalez v. State*, 195 S.W.3d 114, 118–19 (Tex. Crim. App. 2006); *Schindler v. State*, No. 02-17-00241-CR, 2018 WL 4924946, at *3 (Tex. App.—Fort Worth Oct. 11, 2018, pet. filed) (mem. op., not designated for publication). Article 38.49 codifies the doctrine. *Schindler*, 2018 WL 4924946, at *3; *Shepherd*, 489 S.W.3d at 574; *see* Tex. Code Crim. Proc. art. 38.49.

However, as the State points out, Appellant does not bring an issue challenging the trial court's ruling that he committed forfeiture by wrongdoing or the admission

of evidence explicitly covered by the ruling, and we do not read his issue to raise Confrontation-Clause complaints about the evidence he does challenge. We therefore address his complaints as evidentiary, not constitutional, accepting the parties' shared understanding that Article 38.49 does not operate as a hearsay exception without so holding. *See Woods v. State*, No. 08-07-00203-CR, 2009 WL 3790013, at \*5 (Tex. App.—El Paso Nov. 12, 2009, pet. ref'd) (not designated for publication) (holding that the doctrine of forfeiture by wrongdoing applies only to an objection based on the Confrontation Clause and that it is not a hearsay exception). *But see Gonzalez*, 195 S.W.3d at 119 ("[C]ourts have widely accepted the doctrine of forfeiture by wrongdoing to reject both hearsay objections and confrontation claims[.]").

### B. Appellant's Objection that the Family Violence Packet Was Hearsay Initially Preserved His Complaint About that Exhibit.

The trial court admitted the family violence packet over Appellant's objections that it was hearsay, that no exception to the hearsay rule applied, that it was irrelevant, and that it was not properly authenticated. Appellant complains on appeal that the family violence packet was admitted over his hearsay objection. The State contends that Appellant's hearsay objection was global and that because some of the information in the document was admissible under the "Then-Existing Mental, Emotional, or Physical Condition" exception to the hearsay rule, Tex. R. Evid. 803(3), his general objection did not preserve his complaint about the admission of the family violence packet. We disagree with the State's premise and conclusion.

8

We have reviewed the six-page family violence packet prepared on August 23, 2014 by M.C. and a Fort Worth detective who did not testify at trial as well as Detective Russell's testimony describing the packet.  Detective Russell testified:

- The family violence packet is "a breakdown on how the victim and how the suspect are related, any kind of previous history of a protective order, any kind of intimate partner violence risk assessments.  Basically, the victim's name and information and where the offense was located at and what time and date of the offense";

- On-scene police officers who take the report complete the packet with all complainants in domestic-violence cases;

- The packets are kept as part of the case file;

- Detective Russell was assigned the case about six months after M.C. reported the assault;

- Detective Russell reviewed the case file with M.C.;

- Page 3 of the packet "is a body diagram of [M.C.], and it actually has arrows pointing to her actual pain locations, injury locations"; and

- M.C.'s written statement in Spanish appears at the end of the packet.[3]

Based on our review of the family violence packet and Detective Russell's testimony, the family violence packet appears to be a customary part of a Fort Worth Police Department police report in domestic violence cases.  Police reports are not admissible in criminal cases.  *See* Tex. R. Evid. 803(8); *Cole v. State*, 839 S.W.2d 798, 806 (Tex. Crim. App. 1990), *reh'g granted*, 839 S.W.2d 806, 811 (Tex. Crim. App. 1992)

---

[3]Detective Russell testified that he had the statement translated into English, but in our review of the record, we did not see that a translation of M.C.'s statement was admitted during the guilt-innocence phase.

(clarifying original opinion holding that evidentiary rule 803(8) cannot be circumvented by the business records exception in rule 803(6) and finding the State's motion for rehearing without merit); *Kennedy v. State*, 193 S.W.3d 645, 659–60 (Tex. App.—Fort Worth 2006, pet. ref'd) (op. on reh'g en banc). The family violence packet in this case is therefore inadmissible hearsay in its entirety. Consequently, Appellant's hearsay objection initially preserved his complaint.

### C. A Party Must Timely and Repeatedly Object, Obtain a Running Objection, or Object Outside the Jury's Presence.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015). Even though Appellant's complaint about the family violence packet was initially preserved by his objection, the preservation rule requires a party to object each time objectionable evidence is offered unless the party has obtained a running objection or has requested a hearing outside the presence of the jury. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *see also Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (explaining that Texas applies the "futility rule," meaning that even after a trial court overrules an objection to evidence, a party must keep making "futile" objections on pain of waiver). Unobjected-to testimony about objected-to evidence results in forfeiture of the objection. *See Clay v. State*, 361 S.W.3d

762, 767 (Tex. App.—Fort Worth 2012, no pet.) ("[B]ecause Wallace provided testimony about the Louisiana records without objection before and after [Clay's] objection to the admission of the records and because [Clay] failed to obtain a running objection, we conclude that he forfeited his objection to the records' admission." (footnote omitted)); *see also Walker v. State*, No. 02-16-00418-CR, 2018 WL 1096060, at *4 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op., not designated for publication). A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Ford*, 305 S.W.3d at 532. Preservation of error is a systemic requirement that this court should review on its own motion. *Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016).

## D. Appellant Did Not Timely Object to the Testimony of Detective Russell About the Family Violence Packet.

All of Detective Russell's testimony presented above about the family violence packet was admitted without objection and before Appellant made a running objection "on this line [of] questions." Appellant therefore did not preserve his complaint about Detective Russell's testimony regarding the family violence packet. *See* Tex. R. App. P. 33.1(a)(1).

## E. A Running Objection Does Not Usually Cover Multiple Witnesses.

A running objection does not generally preserve objections to the same or similar testimony of other witnesses unless the objection explicitly references the testimony of such other witnesses. *See Garner v. State*, No. 02-15-00171-CR,

2016 WL 4247970, at *6 (Tex. App.—Fort Worth Aug. 11, 2016, pet. ref'd) (mem. op., not designated for publication) ("As Garner did not object to Gus's testimony, Garner did not preserve his complaints regarding the same testimony by Michelle."); *Warner v. State*, No. 02–07–00464–CR, 2009 WL 2356861, at *3 (Tex. App.—Fort Worth July 30, 2009, pet. ref'd) (mem. op., not designated for publication) ("[Warner] did not ask for his running objection to Officer Gonzales's testimony to apply to all witnesses . . . [a]nd . . . failed to object when Daniel Rhodes testified about [Warner's] statements in the home. Thus, he failed to preserve his complaint as to that testimony."); *see also Stafford v. State*, 248 S.W.3d 400, 410 (Tex. App.—Beaumont 2008, pet. ref'd) ("While Stafford requested, and was granted, a running objection to Totino's testimony, the record does not indicate he requested that his running objection be applied to all witnesses . . . . Therefore, Stafford has failed to preserve for appellate review any alleged error.").

### F. Appellant Did Not Object to Kathryn Jacob's Testimony.

After Detective Russell testified, Kathryn Jacob testified about the contents of the family violence packet without any new objection:

> Q. . . . I'm showing you what's been marked as State's Exhibit 126, a packet from the Fort Worth Police Department. Have you seen something like that before?
>
> A. I have.
>
> Q. Okay. And you are aware that the Fort Worth Police Department uses a version of a lethality assessment in their standard packet?
>
> A. I know.

12

Q.     And it contains many of the same questions that are asked in the Jackie Campbell assessment?

A.     It does.

Q.     In looking at this specific lethality assessment—was one performed on this individual?

A.     It was.

Q.     Okay. And they asked similar questions. Is that fair?

A.     That's fair.

Q.     Okay.  Did this person indicate that the suspect had been violent towards them in the past?

A.     Yes.

Q.     That the suspect had access to firearms or weapons?

A.     Yes.

Q.     That the suspect had ever used weapons against them or threatened to?

A.     Yes.

Q.     That they had been seriously injured by the suspect?

A.     Yes.

Q.     That the suspect abuses alcohol and drugs?

A.     Yes.

Q.     That the suspect has been abusive when drinking or using drugs?

A.     Yes.

Q.     That the suspect has been violent in front of others or in public?

A.     Yes.

Q.     The suspect has ever put his hands or objects around your neck and squeezed or choked?

A.     Yes.

Q. Was this person at the time currently pregnant?

A. Yes.

Q. Does the suspect have few friends or seem emotionally dependent on you?

A. Yes.

Q. Does the suspect seem unusually jealous, possessive or to consider you his or her property?

A. Yes.

Q. Has the suspect ever been violent when you left or talked about leaving him?

A. Yes.

Q. Has the suspect ever forced you to have sex against your will?

A. Yes.

Q. Have police been called out regarding violence between you and the suspect?

A. Yes.

Q. Has the suspect recently lost his job or had trouble keeping a job?

A. Yes.

**G. Appellant's Running Objection During Detective Russell's Testimony Did Not Preserve Appellant's Complaint Regarding Kathryn Jacob's Testimony About the Family Violence Packet.**

The trial court's response during Detective Russell's testimony to Appellant's running objection "on this line [of] questions" about the contents of the family violence packet was, "You have objection to all this information going forward. . . . And the exhibits that were just admitted." Appellant did not ask that his objection be extended to other witnesses. Because Appellant did not object again when Kathryn

14

Jacob testified about M.C.'s family violence packet, he failed to preserve his complaints about that testimony.[4]  *See Garner*, 2016 WL 4247970, at \*6; *Warner*, 2009 WL 2356861, at \*3; *see also Stafford*, 248 S.W.3d at 410.

## H.    Appellant Ultimately Did Not Preserve His Hearsay Objection to the Family Violence Packet.

Because between them, Kathryn Jacob and Detective Russell testified about the contents of the family violence packet without objection, Appellant has forfeited his complaints about the trial court's admission of the family violence packet.  *See Clay*, 361 S.W.3d at 767; *Walker*, 2018 WL 1096060, at \*4.  We note in the interest of justice that State's Exhibit 6, which Appellant challenged at trial but not on appeal, contains the most damning information from the packet.  That exhibit is a recording of a 911 call on August 23, 2014 from a nurse in the Obstetrics Emergency Room of Baylor All Saints Andrews Women's Hospital in Fort Worth.  The nurse reported that a patient, M.C., had stated that her boyfriend had attempted to rape her and had put her facedown on a bed, hit her repeatedly on her head and back, and choked her until she lost consciousness.  We overrule Appellant's first issue.

---

[4]Appellant's complaints in this issue about Jacob's unobjected-to expert testimony regarding domestic violence and the import of M.C.'s family violence packet are not preserved, nor does Appellant's conclusion that his trial counsel's "failure to object or to seek a *Daubert* type hearing" resulted in fundamental error—without argument or citation to authority—persuade us.  If a party provides no argument or legal authority to support his position, an appellate court may properly overrule the issue or point as inadequately briefed.  *See* Tex. R. App. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (citing cases).

**III. Appellant Has Not Satisfied His Burden to Prove Ineffective Assistance of Trial Counsel.**

In his third issue, Appellant contends that his trial counsel was ineffective for failing to challenge Kathryn Jacob as an expert witness on domestic violence and for failing to challenge "significant portions of her testimony."

**A. Jacob Testified About Her Qualifications.**

In addition to the testimony about the family violence packet discussed earlier in the opinion, Jacob also testified as follows about her qualifications:

- She is the president and COO of SafeHaven of Tarrant County and has been for a little over two years;

- SafeHaven of Tarrant County is the domestic violence service provider for Tarrant County;

- SafeHaven oversees both of the emergency shelters for victims and all of the nonresidential services for victims and offenders;

- She has been licensed in Texas as a master's level social worker since 2006; and

- She has a focus on domestic violence and has completed extra training in it in the United States and internationally.

**B. Jacob Testified Generally About Domestic Violence.**

Jacob informed the jury about domestic violence. She testified:

- Domestic violence is a pattern of abusive behavior in a relationship . . . caused by power and control of one person over another person[;]

- Intimate partner violence is a specific subset [of domestic violence] that is, in fact, between intimate partners, so a boyfriend and girlfriend, some sort of adult relationship[;]

16

- You do not have to be married. You can be dating, you can be a teenager dating, you can be someone who has a[n] intimate relationship with someone on an ongoing basis[;]

- [W]hen you're assaulted by a stranger, there's a different level of trauma that comes with that than when you're assaulted by someone that you know and trust. There are different dynamics that keep you in that relationship or there are different dynamics that make you react to the person differently than you would if you were, say, raped or sexually assaulted on the street by a stranger[;]

- [T]he cycle of violence is typically what happens when you're in an intimate relationship. It is three stages. The first stage is a kind of honeymoon stage, where everything seems like it's going pretty well. Then there's a stage called tension building, where we often have victims report they feel like they're walking on eggshells. They feel like the relationship feels precarious or dicey. And then there's usually an explosion or an incident that happens, and then you move on to the honeymoon stage.

  The honeymoon stage is, again, where everything seems rosy, oftentimes that's when the offender says things like, I love you so much, please stay with me, brings you flowers, . . . there's a courting component to that. And then that kind of leads again into that tension building and an explosion. . . . [S]o that identifies a pattern of behavior that we call domestic violence. But that cycle can happen within an hour or it can take 20 years for that cycle to repeat itself, and that all depends on the relationship[;]

- It typically takes a victim six to nine attempts to leave their abuser[;]

- The most common times that a serious assault or a homicide happen are when the victim is leaving or the three months after the victim leaves the relationship[;]

- [D]omestic violence is about power and control. That's what domestic violence is. And when the victim decides that they are going to take some of that power and control back and they're

17

going to own their situation, that ends up being very threatening to an offender[;]

- An offender wants to have complete power and control over their victim, and so when a victim has a support network, like family or friends or a church or, you know, other groups that they might be a part of that support them, that threatens that 100 percent power and control that they have over their victim, and so the offenders typically try and take that away from their victim. They don't like it when they're away or where they might have the opportunity to lose some of that power and control[;]

- A strong family relationship would be threatening to an abuser[;]

- In 1985, Dr. Jackie Campbell created a lethality assessment. We call it a danger assessment. That is a series of questions that can help indicate whether a victim is most at risk of a homicide or not or being the victim of a homicide or not[;]

- [W]e at SafeHaven give a lethality assessment to every victim that we see. Like I said, it's a series of questions. They're yes-no questions.

    Some of the questions, when you do the scoring, are weighted heavier than others. So the scoring really depends on if they answer yes and no and which questions they're answering yes or no to. When you do the scoring, the victims fall into several different categories, the worst of which is an extreme high danger. So we use the tool to be able to explain to a victim what their situation really looks like, if they are at risk of homicide. And, oftentimes, it's the first time the victim has ever thought of their situation in that framework[;]

- So oftentimes a victim will put up with a lot before she has children, but once she has children, usually that's when the victim starts thinking about exiting the relationship because they don't want their children to be a part of the relationship.

    Then again, victims tend to intuitively know that that's a dangerous time when they decide to leave. So we really trust our victims to know what is the safest situation for them. So they're going to know is it safe to leave now, is it safer to stay, but when

18

they have children is when things really kind of come to light for them[;]

- We see a lot of pregnant women and women with newborn babies in our shelters[;]

- Pregnancy ends up being a very precarious time in a relationship, even in a healthy relationship. There's a lot of stress on a relationship when someone is pregnant. And so especially when it's—when a woman is pregnant she thinks to herself a lot about is this a—is this a relationship I want to bring my child into, and she oftentimes will decide to leave during pregnancy[; and]

- Women go back to their offenders for a lot of reasons. One is because they think and hope that the offender will change. One is that maybe the offender has access to a house or a car or resources that the victim doesn't have on her own, you know. So when faced with the question of are my children and I going to be homeless versus should we stay in this relationship, a lot of times they pick the devil they know.

## C. Jacob Interpreted the Evidence the Jury Had Already Heard.

When the prosecutor asked Jacob hypotheticals based on the evidence before the jury, she testified:

- I would interpret that[—stealing a vehicle and placing it where it could be damaged beyond repair, such as on railroad tracks—]as a threat, and threats are very common behavior in domestic violence relationships[;]

- [A person's shooting at a partner or her family member as she tries to leave the relationship] would be a[n] indicator of a domestic violence relationship, even just ownership of a gun[;]

- Jealousy is a question on the danger assessment[;]

- Any sort of physical violence or threats of violence are an indicator of domestic violence[;]

19

- Forced sex increases risk of homicide. It is on the danger assessment[;]

- Forced sex is a version of showing power and control [and is common in relationships involving intimate partner violence;]

- If the offender can keep their victim pregnant, they are more able to indicate that their victim isn't going to leave them. You know, if you have a new baby, if you have an infant with someone, you're more tied to your relationship. We see this a lot . . . [;]

- Strangulation and ownership of a gun bear the most weight on the lethality assessment[;]

- [R]esearch shows us that if an offender strangles their partner, the victim is 700 times more likely to be strangled again by their offender and 800 times more likely to be killed by that offender, not necessarily by strangulation[;]

- Strangulation is one of the most intimate forms of physical assault[; and]

- It's very dangerous. You can die from being strangled in a very short amount of time.

**D.     Jacob Interpreted the Family Violence Packet.**

Jacob also gave additional testimony regarding her review of the family violence

packet:

Q.     So you said you give a very similar assessment to people coming to your organization.

A.     We do.

Q.     And if you were to rate this individual, what category would they fall into?

A.     The extreme high danger.

Q.     And that is extreme high danger of lethality at the hands of your abuser?

A.     Correct.  So extreme high danger ends up being an indicator of a potential homicide.

Q.     So it would not shock or surprise you that a person who answered the questions this way ended up dead at the hands of their abuser?

A.     No.

Q.     And what . . . did you say the two most important indicators of a future homicide are?

A.     Possession of a firearm and a history of strangulation.

Q.     And both of those are indicated in this particular questionnaire?

A.     They are.

Q.     Would it surprise you if after an incident that was just described that seemed this serious, that a person, even after a time period, went back to their abuser?

A.     No.  It's very common to return to your abuser.

Q.     Even after some of the most serious of offenses?

A.     Yes.

Q.     Have you seen people suffer extreme trauma at the hands of their offender and go back anyway?

A.     Often.

**E.     Appellant Must Prove by a Preponderance of the Evidence Both Deficient Representation by Trial Counsel and a Reasonable Probability that Without It, the Outcome of His Trial Would Have Been Different.**

To establish ineffective assistance of counsel, Appellant must show by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013).  An ineffective-assistance claim must be "firmly founded in the record," and

"the record must affirmatively demonstrate" the meritorious nature of the claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Ineffective assistance of counsel may properly be raised in a motion for new trial, *Smith v. State*, 286 S.W.3d 333, 341 (Tex. Crim. App. 2009), but is usually best addressed by a postconviction writ of habeas corpus, *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011); s*ee Thompson*, 9 S.W.3d at 814 & n.6; *Ex parte Torres*, 943 S.W.2d 469, 475–76 (Tex. Crim. App. 1997). Direct appeal is usually an inadequate vehicle for raising an ineffective-assistance-of-counsel claim because the record is generally undeveloped. *Menefield v. State*, 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012); *Thompson*, 9 S.W.3d at 813–14.

In evaluating the effectiveness of counsel under the deficient-performance prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307. Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record or when counsel's reasons for failing to do something do not appear in the record. *Menefield*, 363 S.W.3d at 593; *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be

afforded an opportunity to explain his actions before being denounced as ineffective."
*Menefield*, 363 S.W.3d at 593. If trial counsel is not given that opportunity, we should not conclude that counsel's performance was deficient unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308.

The prejudice prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, Appellant must show there is a reasonable probability that, without the deficient performance, the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2070. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S. Ct. at 2069.

There is no requirement that we approach the two-pronged inquiry of *Strickland* in any particular order or even that we address both components of the inquiry if the defendant makes an insufficient showing on one component. *Id.* at 697, 104 S. Ct. at 2069.

**F.** **Appellant Has Failed to Show a Reasonable Probability that Absent Trial Counsel's Deficient Performance, the Result of the Trial Would Have Been Different.**

Appellant did not file a motion for new trial alleging ineffective assistance and have a hearing, so we do not know why his trial counsel did not challenge Jacob's qualifications to testify as an expert or any of her testimony. But even if Appellant's trial counsel's performance was deficient, a holding we do not have to reach, Appellant has failed to show that he was deprived of a trial with a reliable result. *See id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308.

That Appellant shot and killed M.C. was not in dispute, nor was the couple's history of domestic violence. The only real issue at trial was his intent in killing her. His theory was that the shooting was accidental or at least short of murder, the State's theory was that it was murder, and overwhelming evidence supported the State's theory:

- Appellant had a history of violently abusing M.C., including beating her, raping her, strangling her, and shooting at her;

- Early Christmas morning before M.C.'s death, Appellant's four-year-old daughter told her teenaged cousin that he was carrying a gun;

- Appellant lied about his whereabouts in the 911 call after M.C.'s shooting;

- Appellant claimed to have the gun in the 911 call and then to not have it;

- He fled to Mexico after the shooting;

- The police found his gun in his bedroom at his parents' house; and

- His gun was determined to be the gun that shot the bullet lodged in M.C.'s body.

Appellant points to no "objective facts in the record to support any lack of confidence in the conviction." *Williams v. State*, No. 14-13-00708-CR, 2015 WL 5935660, at *6 (Tex. App.—Houston [14th Dist.] Oct. 13, 2015, pet. ref'd) (mem. op., not designated for publication); *see also Bone v. State*, 77 S.W.3d 828, 837 (Tex. Crim. App. 2002). He has therefore failed to satisfy his burden to prove prejudice from his trial counsel's performance. We overrule Appellant's third issue.

## CONCLUSION

Having overruled Appellant's three issues, we affirm the trial court's judgment.

/s/ Mark T. Pittman
Mark T. Pittman
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: January 24, 2019