**AFFIRMED; Opinion Filed May 7, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01445-CR

### TRAVIS TYRELL McGEE, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 296-82415-2015**

## MEMORANDUM OPINION
Before Justices Myers, Osborne, and Nowell
Opinion by Justice Myers

A jury convicted appellant Travis Tyrell McGee of recklessly causing bodily injury to a child, a second degree felony offense, and assessed punishment of twenty years' imprisonment and a $10,000 fine. In five issues, appellant alleges jury misconduct, violation of appellant's Sixth Amendment right to confrontation, and the erroneous admission of hearsay statements. We affirm.

### DISCUSSION

### Jury Misconduct

Appellant's first and second issues allege jury misconduct. In his first issue, appellant contends that the "reasonable possibility that the jury's verdict was impacted by the consideration of Googled legal research on the relevant mens rea elements warrants reversal under the Fifth, Sixth, and Fourteenth Amendments." Appellant's second issue alleges that "[t]he jury's receipt of an extrinsic matter, the character of which is detrimental or adverse to a defendant, warrants

reversal under Texas law."

We review a trial court's decision to deny a motion for new trial for an abuse of discretion. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). The trial court abuses its discretion if no reasonable view of the evidence supports the ruling. *Id*. We view the evidence in the light most favorable to the court's ruling and presuming all reasonable factual findings against the losing party that could have been made were made against that party. *Id*. The trial court is the factfinder and sole judge of the witnesses' credibility; we determine only whether the trial court's decision was arbitrary or unreasonable. *Id*.

A trial court must grant a criminal defendant a new trial if the jury received "other evidence" after retiring to deliberate and the evidence is detrimental or adverse to the defendant. TEX. R. APP. P. 21.3(f); *Bustamante v. State*, 106 S.W.3d 738, 743 (Tex. 2003). In an inquiry into the validity of a verdict, Texas Rule of Evidence 606(b) generally precludes a juror from testifying about any statement made or incident that occurred during the jury's deliberations. TEX. R. EVID. 606(b)(1). However, an exception allows a juror to testify about whether an outside influence was improperly brought to bear on any juror. *See id*. 606(b)(2)(A). An outside influence is "something originating from a source outside of the jury room and other than from the jurors themselves." *McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012). The exception allows evidence of "proof of external pressures that are likely to affect the verdict." *Colyer*, 428 S.W.3d at 124. To constitute an outside influence, the information must be relevant to the issues at trial. *Person v. State*, No. 05–17–00816–CR, 2018 WL 2355930, at *2 (Tex. App.—Dallas May 24, 2018, pet. ref'd) (mem. op. not designation for publication).

An outside influence does not automatically result in a reversal. *Ryser v. State*, 453 S.W.3d 17, 41 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). "'An 'outside influence' is problematic only if it has the effect *of improperly* affecting a juror's verdict in a particular manner—for or

against a particular party.'" *Id.* (quoting *Colyer*, 428 S.W.3d at 129). A trial court may not delve into jury deliberations; therefore, its analysis of whether an outside influence was detrimental to the defendant must be objective and determine if "there is a reasonable possibility that it had a prejudicial effect on the 'hypothetical average juror.'" *McQuarrie*, 380 S.W.3d at 154.

The record in this case shows that all of the jurors had been subpoenaed to testify at the motion for new trial hearing and that they were present in court, but only two—Maud McLaughlin and Yelena Skobeleva—testified at the hearing. Defense counsel stated that he had "no desire to call any other jurors at this point," and the State did not call any other jurors to testify.

McLaughlin testified that she remembered another juror whose name she did not know, "a Russian lady," bringing in three to four pages of legal definitions obtained from Google-based internet research. She did not remember what the definitions actually said. Asked if they varied from what was contained in the court's charge, she replied, "I mean, it was, like, huge. It was three or four pages on it. And, I mean, I don't think it really helped that much, to be honest with you. I remember that day we just wrote down both definition[s] on the board [in the jury room] and we went over it several times and read it." She could not recall if the definitions they wrote on the board came from the internet research or the jury charge. McLaughlin also could not recall which of the three legal terms—intentional, knowing, or reckless—the internet research related to.

Skobeleva, who explained that English was her second language, testified that the jury had a problem with the definitions in the court's charge. She was struggling to understand those definitions and did some research on the internet, bringing in the printed definitions of "intent or not intent" or "intentional not intentional," she was not sure which one. She could not remember the website from which she obtained this material—it may have been a dictionary website—and she could not recall whether it was Texas law, federal law, or some other law. Skobeleva also could not say what the definition was and she could not remember the "exact wording." She

thought it may have been the same as the definition in the court's charge, but added that there was only one copy of the charge for twelve people and she did not remember the document well. Asked if she showed the material to other members of the jury, she said the printed material was on the table in the jury room and she could not say "for sure" which of the other jurors had or had not seen it. Nor was she sure how many pages in length the document was; it was more than one page but not more than five—perhaps three pages in length. She no longer had this printed material in her possession. Later, when asked if she had looked up the meaning of other terms as well, she said she could not remember.

Matthew Goheen, one of the two attorneys who represented appellant at trial, spoke with the jurors after the verdict. According to his testimony, some of the jurors told him they were struggling with the definitions of intentionally, knowingly, and recklessly. Asked if an alternate definition of "recklessly" was brought into the jury room, Goheen replied, "Going by what was said, I can say only that it seemed to include some sort of definition or explanation not contained in the jury charge." He added that "recklessness" was brought up by the jury and the jurors seemed to indicate they were struggling with the term "recklessly" as a culpable mental state. Jurors told him that some outside research had been conducted and "they took all of that, along with the charge, and put it up on the white board" in the jury room "and used that in their deliberations." Those definitions were not on the board when Goheen was in the jury room. The jurors never considered a "not guilty" verdict, according to what they told Goheen; they were just considering whether the charged conduct was intentional, knowing, or reckless.

The last witness, Brandon Wonnacott, the lead prosecutor on the case, recalled being told that someone on the jury had looked up the definitions of knowingly and recklessly. But he did not know whether that outside research was consistent with the jury charge. The jury had determined "very early on" that the charged conduct was not an intentional crime; they were only

—4—

trying to decide between knowingly and recklessly. Those definitions were confusing to them. There was no indication they were ever going to find appellant not guilty "or anything like that in this case."

The trial court found that the research was an outside influence. The court questioned the attorneys, allowing the attorneys to argue at length regarding whether there was an adverse impact on the defendant. But the court made no finding on that and ultimately denied the motion for new trial via a written order several days after the motion for new trial hearing.

Reviewing the record, there is no question extrinsic information of some kind was received by the jury in this case, but the record is far from clear as to exactly what sort of outside influence was brought into the jury room, much less whether it was of an adverse nature. Witness accounts varied as to precisely what happened and what term or terms were researched, and the witnesses could only agree that the information concerned the meaning of one, or perhaps both, of the applicable mental states. It is equally unclear from which online source or website this information was obtained, or its length.

These facts stand in sharp contrast to the situation in other cases we have examined, where the court was able to determine, with far more assurance than we have here, just what sort of outside influence was brought into the jury room, and then measure its prejudicial effect, if any, on the hypothetical average juror. *See, e.g., McQuarrie*, 380 S.W.3d at 154–55 (internet research conducted by juror after deliberations had begun on effects and efficacy of "date rape" drugs); *Ryser*, 453 S.W.3d at 41 (one of the jurors looked up term "mistreatment" in Webster's dictionary before second day of jury deliberations began and shared that definition with other jurors as they deliberated); *Person*, 2018 WL 2355930, at **2–3 (juror conducted internet research on background of witness who testified he received the Congressional Medal of Honor).

This is not to suggest we condone do-it-yourself research by jurors. Jurors take an oath to

render a true verdict according to the law and the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 35.22. This means the law as explained by the court, not the law according to the internet. But the meager record presented here makes it impossible for us to determine whether the outside influence that was brought into the jury room had the effect of *improperly* affecting the jury's verdict in a particular manner, either for or against appellant. *See Ryser*, 453 S.W.3d at 41. Accordingly, we cannot say the trial court abused its discretion by denying appellant's motion for new trial. We overrule appellant's first and second issues.

## Dai Garner's Out-of-Court Statements

Appellant's third issue argues the trial court erroneously granted the State's motion requesting a forfeiture by wrongdoing, which concerned out-of-court statements that appellant's girlfriend, Dai Garner, allegedly made to Dallas Police Detective Corey Foreman, thereby denying appellant his Sixth Amendment right to confrontation. Appellant's fourth issue argues that if we conclude the State's motion requesting a forfeiture by wrongdoing was not granted, then the trial court erroneously admitted harmful hearsay evidence without exception or justification.

We review a trial court's decision admitting or excluding evidence for abuse of discretion. *See Shepherd v. State*, 489 S.W.3d 559, 572 (Tex. App.—Texarkana 2016, pet. ref'd); *Espinoza v. State*, No. 05–17–00547–CR, 2018 WL 6716619, at *7 (Tex. App.—Dallas Dec. 21, 2018, no pet.) (mem. op., not designated for publication); *Thompson v. State*, No. 10–16–00238–CR, 2017 WL 3182988, at *1 (Tex. App.—Waco July 26, 2017, no pet.) (mem. op., not designated for publication); *see also Schindler v. State*, No. 02–17–00241–CR, 2018 WL 4924946, at *5 (Tex. App.—Fort Worth Oct. 11, 2018, no pet.) (mem. op., not designated for publication). A trial court abuses its discretion when its decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Shepherd*, 489 S.W.3d at 572.

A defendant in a criminal prosecution has a Sixth Amendment right to be confronted with

the witnesses against him. *Giles v. California*, 554 U.S. 353, 357–58 (2008); *Gonzalez v. State*, 195 S.W.3d 114, 116 (Tex. Crim. App. 2006); *Shepherd*, 489 S.W.3d at 573. Even though a hearsay statement offered against the defendant may be otherwise admissible under the rules of evidence, the Confrontation Clause may be implicated if the defendant has not had the opportunity to confront the out-of-court declarant. *Gonzalez*, 195 S.W.3d at 116; *Shepherd*, 489 S.W.3d at 573. But declarations made by a declarant whose unavailability the defendant procured may be admitted as an exception even though the defendant did not have an opportunity to confront the declarant. *Shepherd*, 489 S.W.3d at 573.

Under the doctrine of forfeiture by wrongdoing, the defendant is barred from asserting his right of confrontation when he wrongfully procured the unavailability of the witness. *Id*. Under *Giles*, this exception applies "only when the defendant engaged in conduct *designed* to prevent the witness from testifying." *Giles*, 554 U.S. at 359; *Shepherd*, 489 S.W.3d at 573. The Supreme Court requires that there must be some showing by the proponent of the statement that the defendant intended to prevent the witness from testifying. *Giles*, 554 U.S. at 361–62; *Shepherd*, 489 S.W.3d at 573. "[F]orfeiture by wrongdoing applies even when the defendant has multiple reasons for harming the witness, so long as one of the reasons is to prevent her from testifying." *Shepherd*, 489 S.W.3d at 573. Forfeiture by wrongdoing may also apply "even though the act with which the accused is charged is the same as the one by which he allegedly rendered the witness unavailable." *Gonzalez*, 195 S.W.3d at 127

Article 38.49 of the Texas Code of Criminal Procedure "is a codification of the forfeiture by wrongdoing doctrine, and its requirements substantially correspond to those set out in *Giles*." *Schindler*, 2018 WL 4924946, at *3; *see also Shepherd*, 489 S.W.3d at 574; *Espinoza*, 2018 WL 6716619, at *7. Article 38.49 provides in part as follows:

> (a) A party to a criminal case who wrongfully procures the unavailability of a witness or prospective witness:

–7–

(1) may not benefit from the wrongdoing by depriving the trier of fact of relevant evidence and testimony; and

(2) forfeits the party's right to object to the admissibility of evidence or statements based on the unavailability of the witness as provided by this article through forfeiture by wrongdoing.

(b) Evidence and statements related to a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of a witness or prospective witness are admissible and may be used by the offering party to make a showing of forfeiture by wrongdoing under this article, subject to Subsection (c).

(c) In determining the admissibility of the evidence or statements described by Subsection (b), the court shall determine, out of the presence of the jury, whether forfeiture by wrongdoing occurred by a preponderance of the evidence. If practicable, the court shall make the determination under this subsection before trial using the procedures under Article 28.01 of this code and Rule 104, Texas Rules of Evidence.

(d) The party offering the evidence or statements described by Subsection (b) is not required to show that:

(1) the actor's sole intent was to wrongfully cause the witness's or prospective witness's unavailability;

(2) the actions of the actor constituted a criminal offense; or

(3) any statements offered are reliable.

TEX. CODE CRIM. PROC. ANN. art. 38.49.

During a pretrial hearing held shortly before opening statements, the State notified the trial court that it wanted to offer hearsay statements that had been made by Garner to Foreman when he interviewed her. The State argued those statements were admissible under the doctrine of forfeiture by wrongdoing because appellant had written to Garner instructing her to absent herself from the trial. In support of this argument, the State offered a January 26, 2017 letter appellant had allegedly written to Garner while he was incarcerated. It reads as follows:

Hey Baby,
How you doing, hope all is well w/ you and our son. Just to let you know I talked to Jon today and no good news, basically the state have made up their mind not to give me probation, bc they believe that I did it based off the statements ya'll gave them. Im running out of options and I really need you in this moment of agony. You need to find me a free-world lawyer thats the only option I have left, or else I

would will be facing 5-99 yrs in prison. Please really take time and think about this carefully. That's 5 yrs away from you and our son. If you really love me as you say you do you need to move asap! Start calling or consulting w/ lawyers, call them and discuss whats going on Baby. If ~~they~~ we set it for trial, you (CANNOT SHOW UP) I repeat you cannot show up in court. Bc if you do they'll have you approve your testimony/statement and then persecute me w/ it. But like I stated Im on a count down, last announcement is Feb. 23. Please talk to somebody Dai. I asked for the Attorney Bond and he considered it, but said that people always run off and cut there [sic] ankle monitors. So yeah he really don't care. Shoot who does really. I love you and I hope ya'll day went well okay. So just get back w/ me regarding this issue please. Have a blessed day Baby.

The State also offered court documents concerning a previous misdemeanor criminal charge of assault causing bodily injury, family violence, against appellant for assaulting Garner—a charge that was ultimately dismissed. The December 8, 2015 information alleged that appellant intentionally, knowingly, and recklessly caused bodily injury to Garner by striking her with his hand, and that she was then and there a member of appellant's family or household or was in a dating relationship with him. The State's March 23, 2017 motion to dismiss stated that the charge should be dismissed because the evidence was insufficient and the State had attempted to serve the complaining witness and was unable to do so. The State told the trial court during the motion for new trial hearing that the assault charge "evidently" had to be dismissed because Garner could not be located and served with a subpoena to testify despite two attempts to serve her. The State added that successive attempts to serve Garner to testify in the trial of this case had been similarly unsuccessful. In fact, the record shows Garner was successfully served for the first trial setting, but subsequent attempts to serve her in June and September of 2017, prior to the third and final trial setting, were unsuccessful. In addition, the State told the trial court it had tried calling the telephone number that appellant "was speaking to her on the phone from the jail," but she did not return their calls.

Defense counsel challenged the admission of the letter, objecting that it was hearsay and that its admission would violate rule 403. He argued that it only showed appellant was asking

Garner not to appear and that appellant was not demanding she not appear or threatening her. He also argued it was unclear if the letter was referring to this case or the prior assault case. The trial court overruled the defense's objections, noting that the letter explicitly stated that Garner "CANNOT SHOW UP" in court. Later that day, when the State offered Garner's out-of-court statements before the jury through Foreman's testimony, the defense reargued its hearsay objection. The trial court again overruled the defense's two hearsay objections and allowed Foreman's testimony.

Foreman testified that he spoke to Garner about the offense twice—once at the hospital and again several days later at the Children's Advocacy Center (CAC). At the hospital, Garner told him she had been sleeping and that she awoke to find appellant in the bathroom with the complainant, AM. AM was sitting on appellant's knee and appellant was talking to him, but when AM stood up, he "kind of collapsed because his legs" were "like a noodle." Garner went back to bed, and appellant got in bed with AM. Garner told appellant to call 911 because she thought something was wrong with AM, but appellant called her a "drama queen." At the CAC, Garner told Foreman she saw no bruising or marks on AM prior to his collapse; AM had eaten cereal earlier in the day and was playing; "[h]e was absolutely fine." Except for one of appellant's male friends, "Boozy" Flowers, everyone was taking a nap that day, and Garner awoke to find appellant in the bathroom with AM. She went back to bed with her son, KM, but she heard appellant saying AM's name, so she returned to the bathroom to check on them. Later, at the hospital, appellant told Garner he spanked AM because he had pooped and peed on himself. Garner also told Foreman that appellant was the only person who disciplined AM.

The day after Foreman testified Garner appeared in court, where she was personally served with a subpoena by Greg Bowers, an investigator with the Collin County District Attorney's Office. On the stand, she denied receiving any telephone calls from the State, and she denied

knowing that the State had been trying subpoena her. She admitted receiving a subpoena for the first trial setting, but denied receiving one for the second. Garner claimed she was there to support appellant. She acknowledged that she was present when AM was injured, but denied she hurt him and she claimed she did not know who did. When confronted with her testimony from a prior hearing held in July of 2016, where she stated that she believed appellant was responsible for AM's injuries, Garner admitted she had previously blamed appellant for AM's injuries. But she said she no longer believed that. She denied that she was perjuring herself; she claimed her opinion had changed because she had spoken to appellant since she had last testified. She admitted that she loved appellant and that during his year-long incarceration she had regularly visited him in jail and called him.

The State points out that the defense's objections during the hearing on the admissibility of Garner's statements were based on hearsay and rule 403, not the Confrontation Clause. And when Detective Foreman testified regarding Garner's statements, the only defense objections were hearsay. Preservation of error requirements apply to Confrontation Clause complaints. *See Reyna v. State*, 168 S.W.3d 173, 179–80 (Tex. Crim. App. 2005); *Deener v. State*, 214 S.W.3d 522, 527 (Tex. App.—Dallas 2006, pet. ref'd); *Munguia-Zarate v. State*, Nos. 05–17–00265–CR, 05–17–00266–CR, 2018 WL 6322165, at *6 (Tex. App.—Dec. 4, 2018, no pet.) (mem. op., not designated for publication). A defendant's failure to object on Confrontation Clause grounds at trial waives that complaint for appellate review. *See Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004); *Munguia-Zarate*, 2018 WL 6322165, at *6; *Briggs v. State*, No. 05–17–00415–CR, 2018 WL 2749649, at *5 (Tex. App.—Dallas May 31, 2018, no pet.) (mem. op., not designated for publication).

Nevertheless, even if we assume appellant's claim was preserved and that there was a confrontation issue in this instance, the trial court did not err in admitting Garner's statements.

–11–

According to the State, appellant's role in wrongfully procuring Garner's absence from trial is shown by the letter appellant to wrote to Garner; the State's unsuccessful efforts to serve Garner; and the court records showing the misdemeanor family violence charge against appellant was dismissed because the State was unable to serve Garner, the complainant. Appellant responds that the forfeiture by wrongdoing evidence was admitted either erroneously or, perhaps, not at all—the record is unclear. He points out that the letter was not properly authenticated and was only admitted at the hearing for record purposes, and that the misdemeanor court records were not admitted at all, even for record purposes. Also, the State asked the trial court to take judicial notice of the court records but they were never formally judicially noticed by the court.

The record does not show that the letter or the court records were formally admitted into evidence. Yet they were offered by the State, discussed by both parties, considered by the trial court, and are included in the record on appeal. Defense counsel objected to the letter, not the court records, and the trial court implicitly overruled that objection when it referenced and quoted from the letter in overruling the defense's objections. Additionally, the trial court did not deny the State's request to take judicial notice of the court records, and both parties referenced them during arguments to the court. We also note that the defense did not dispute the authenticity of the letter or the court records at the hearing. In fact, defense counsel acknowledged appellant wrote the letter, that Garner was the complainant in the prior misdemeanor assault case, and that the prior case had been dismissed:

> As far as the work, the struggle the DA's Office did to find her, um, I don't gauche [sic], they never ran into somebody who told them, Travis [appellant] said don't show up or anything. We have a letter that he wrote explaining the possibility of what might happen if she shows up, in fact, even advising her to go find her own attorney to go talk to the State.
>
> She was the named victim in the County Court at Law case, alleged named victim in that case, and it has since been dismissed.
>
> If the trial court and the parties, without objection, treat certain proof as though it was

–12–

admitted into evidence, it is not error for the trial court to consider the same in reaching its decision. *See, e.g., Ex parte Reagan*, 549 S.W.2d 204, 205 (Tex. Crim. App. 1977); *Richardson v. State*, 475 S.W.2d 932, 933 (Tex. Crim. App. 1972); *Knoten v. State*, No. 10–11–00261–CR, 2012 WL 579701, at *2 (Tex. App.—Waco Feb. 22, 2012, no pet.) (mem. op., not designated for publication); *Smith v. State*, No. 05–04–01036–CR, 2005 WL 1405791, at *4 (Tex. App.—Dallas June 2, 2005, no pet.) (mem. op., not designated for publication); *Durham v. State*, No. 05–03–01381–CR, 2004 WL 2591404, at *5 (Tex. App.—Dallas Nov. 2, 2004, no pet.) (mem. op., not designated for publication).

Appellant also contends that, even if the evidence was properly admitted or was properly before the court, it does not show wrongdoing or unavailability. He argues that the letter did not threaten Garner or demand she avoid service; it did nothing more than ask her not to attend the trial and make herself available as a witness. Appellant adds that the letter was written months before trial; on the date it was written (January 26, 2017) the State had not yet applied for a subpoena to secure Garner's attendance at trial; and that Garner had appeared in court on a prior setting after receiving the letter.

But the doctrine of forfeiture by wrongdoing "is based on the principle that '*any* tampering with a witness should once and for all estop the tamperer from making any objection based on the results of his own chicanery.'" *Gonzalez*, 195 S.W.3d at 117 (emphasis added) (quoting 5 JOHN H. WIGMORE, EVIDENCE § 1406 at 219 (Chadbourn rev. 1974)). "In other words, the rule is based on 'common honesty' and the maxim that 'no one shall be permitted to take advantage of his own wrong.'" *Id*. (quoting *Reynolds v. United States*, 98 U.S. 145, 159 (1878)). A direct threat or demand from the defendant to the witness to avoid service or not appear in court is not required. *Espinoza*, 2018 WL 6716619, at *13. What is required is that the defendant procured the witness's absence through wrongdoing. *See Gonzalez*, 195 S.W.3d at 117.

–13–

Cases employing the doctrine have relied on a variety of evidence to find wrongdoing, including actual violence or threats of violence, bribes, financial dependency, interference with and failed service, and statements or instructions to the witness regarding how to avoid service. *See, e.g., Shepherd*, 489 S.W.3d at 574–75; *Espinoza*, 2018 WL 6716619, at **8–10; *Schindler*, 2018 WL 4924946, at **4–6; *Thompson*, 2017 WL 3182988, at **1–4; *Sears v. State*, No. 09–15–00161–CR, 2017 WL 444366, at **18–23 (Tex. App.—Beaumont Jan. 31, 2017) (mem. op., not designated for publication), *rev'd on other grounds*, No. PD–0264–17, 2018 WL 4347878 (Tex. Crim. App. Sept. 12, 2018).

In this case, the letter appellant wrote to Garner provided the court with ample evidence of wrongdoing. It was coercive in nature and explicitly told Garner she "CANNOT SHOW UP." Appellant's arguments notwithstanding, the letter was not an innocuous request. It also pressured Garner with guilt, threatened the loss of support, both emotional and financial, and implicitly threatened the loss of appellant's affection. As for appellant's argument that the letter did not have a coercive effect because it was written months before trial and because Garner appeared in court once after receiving it, this argument assumes Garner received the letter, was unaffected by it, and willingly accepted subpoena service months later. Yet it is equally possible Garner received the letter and *was* affected by it, but was simply unsuccessful at avoiding service the first time. In addition, the trial court could have concluded the letter had a coercive effect that increased over time, and that rereading the letter and reflecting on it weakened Garner's resolve to testify. Moreover, appellant's argument considers the letter in isolation, but it was far from the only evidence supporting a finding of forfeiture by wrongdoing. Along with the letter, there was evidence appellant had been charged with assault family violence but the charge had been dismissed and the State was unable to locate the victim, Garner, for service. And though the State had successfully served Garner once before in these proceedings, it could not subsequently locate

her.

We conclude that the trial court could have reasonably found that appellant wrongfully procured the unavailability of Dai Garner as witness. The record supports a finding that appellant engaged in conduct deliberately intended to prevent her from testifying. Therefore, the trial court did not abuse its discretion in admitting Garner's out-of-court statements based on the "forfeiture by wrongdoing" exception to the Confrontation Clause.

There remains the matter of appellant's alternative argument that the trial court erred by overruling his hearsay objections and allowing inadmissible, objected-to hearsay into evidence. The State argues that when it enacted article 38.49, the legislature intended forfeiture by wrongdoing to be an exception to the hearsay rule *and* the right of confrontation. Prior to the enactment of article 38.49, however, two courts of appeals had opined that forfeiture by wrongdoing doctrine was not an exception to the Texas hearsay rule. *See Garcia v. State*, No. 03–11–00403–CR, 2012 WL 3795447, at *11 n. 12 (Tex. App.—Austin Aug. 29, 2012, pet. ref'd) (mem. op., not designated for publication); *Woods v. State*, No. 08–07–00203–CR, 2009 WL 3790013, at *5 (Tex. App.—El Paso Nov. 12, 2009, pet. ref'd) (mem. op., not designated for publication). We need not resolve this question because review of the record shows that any error in this instance was harmless.

There were two hearsay objections from the defense to Detective Foreman's testimony regarding Garner. The first objection concerned Garner telling Foreman, during their first interview, that she had been sleeping, along with the others, when she awoke to find appellant in the bathroom with AM; that she found AM sitting on appellant's knee and appellant was talking to him; that when AM tried to stand he "kind of collapsed" because his legs were "like noodle;" and that Garner told appellant to call 911 because she thought something might be wrong, but appellant called her a "drama queen." The second objection was based on Foreman's testimony

that, during their second interview at the CAC, Garner told him AM had eaten earlier in the day and "was fine."

Appellant argues that Garner's statements were instrumental in rebutting one of his defensive theories, i.e., the injuries to AM could have occurred previously or have been caused by some other individual. Appellant further argues that the alleged error in admitting the statements was never cured because the State failed to question Garner about them when she appeared and testified. But Garner testified in appellant's favor and contradicted her earlier accusation against appellant, and she was a hostile, uncooperative witness for the State. Indeed, she avoided service and refused to talk to the State before showing up in court unannounced and taking the stand. Also, the defense had the opportunity to cross-examine Garner about those prior statements, but passed the witness without asking any questions.

More importantly, Garner's out-of-court statements were far from the only evidence implicating appellant in the offense. During his two recorded interviews with Detective Foreman, appellant admitted his role in the offense, stating that he alone physically disciplined AM; that AM was frightened of him; that he was upset with AM because AM had pooped and peed on himself; that he "whupped" AM with a belt (which was how he usually disciplined him) before AM collapsed; and although he never hit, punched, or slapped his son, he pushed AM repeatedly, sat on him, and was "rough" with the child. Appellant admitted the force he used was excessive and wrong, and that he probably pushed AM too hard. Appellant agreed that he caused AM's injuries, which, according to the testimony of the treating physician at Children's Medical Center, included a severe laceration of his liver, a bruised pancreas, a fractured rib, damage to his intestines, perforated bowels, and bruising to his abdomen. The doctor attributed these injuries to "[b]lunt abdominal trauma," and they were inconsistent with being struck with a belt or, in all likelihood, according to the doctor, with being sat on. In addition, during appellant's two interviews, the

–16–

detective stated that Garner told him she had bathed AM earlier that morning and he had no bruises. Foreman also stated that Garner told him AM was fine when he went into the bathroom alone with appellant. Foreman detailed that both Garner and "Ant," a friend of appellant's, told him AM had eaten cereal that morning. Appellant admitted that AM had eaten some cereal before his nap, had been playing, and that he was "fine" before appellant "spanked" him that day. Finally, although both sides referred to Garner during their closing arguments, they never specifically referred to what she told Foreman, and their comments concerned her trial testimony, not her out-of-court statements.

A complaint about the erroneous admission of evidence is non-constitutional error as provided in rule 44.2(b), requiring that any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded. TEX. R. APP. P. 44.2(b); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). A substantial right is not affected, and error will be deemed harmless, if, after reviewing the entire record, the appellate court determines that the error did not influence, or had only a slight influence, on the trial outcome. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). When conducting a harm analysis under rule 44.2(b), everything in the record, including evidence of a defendant's guilt, is a factor to be considered. *Motilla*, 78 S.W.3d at 357.

In this case, our review of the record shows that the State introduced substantial evidence of guilt. In fact, appellant does not challenge the sufficiency of the evidence. The jury had ample evidence from which it could rationally find that each element of the offense was proven beyond a reasonable doubt. We conclude that any error in overruling appellant's hearsay objections was harmless, and we overrule appellant's third and fourth issues.

**Hearsay Statements from AM and AM's Mother**

In his fifth issue, appellant contends that the trial court erred in admitting testimony from

Detective Foreman about hearsay statements that AM and AM's mother, Nakia, made to him.

During the direct examination of Detective Foreman, he testified in part as follows:

Q. After speaking with Dai, did you speak with anybody else?

A. Um, I spoke with [AM]'s mother, I believe.

Q. Okay. And how did that conversation go?

A. Well, I just talked to her about [AM] and how he was before he came down. Was he okay. Did he have any medical issues, any medical problems, any physical disabilities, any injuries, or anything. And she made it clear that [AM] was fine.

[DEFENSE COUNSEL]: Objection to hearsay, Your Honor.

THE COURT: Overruled.

Later, the detective testified:

Q. All right. Now, we learned a little bit of new information today; is that right?

A. We did.

Q. We actually had a chance to speak with [AM], right?

A. Yes, we did.
Q. Now, where is [AM] living right now?

A. I believe with his mother in Mississippi.

Q. Okay. So he came to trial today, right?

A. Correct.

Q. What kind of new information did we just learn on this case?

A. That [AM] had told his mother that not only the defendant—

[DEFENSE COUNSEL]: Objection to hearsay. They said—they said he's available.

THE COURT: Sustained. You might want to rephrase the question.

Q. (By [THE STATE]) Did you learn new information?

A. I did.

Q. Did you learn new—the information that you learned, does that change at all your opinion of whether or not the defendant is responsible for this?

–18–

A. No.

Q. Okay. Why not?

A. Well—

> [DEFENSE COUNSEL]: Objection, calls for hearsay. Calls to refer back to your —
>
> THE COURT: Overruled.

A. Well, the defendant gave me several incidents, several ways that he harmed the child that could have placed him—that could have placed [AM] in the hospital.

The trial court's decision to admit or exclude evidence over objection is reviewed for abuse of discretion. *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008). The decision is only reversible for a clear abuse of that discretion. *Id.* As long as the court's decision lies within the zone of reasonable disagreement, it will be upheld. *Id.*

Hearsay is generally inadmissible except as provided by statute or rule. TEX. R. EVID. 802; *Riney v. State*, 60 S.W.3d 386, 388 (Tex. App.—Dallas 2001, no pet.). Hearsay is an out-of-court statement offered for the truth of the matter asserted. TEX. R. EVID. 801(d). A "statement" is a person's oral or written verbal expression, or nonverbal conduct that a person intended as a substitute for verbal expression. *Id.* 801(a). The "matter asserted" means (1) any matter a declarant explicitly asserts; and (2) any matter implied by a statement, if the probative value of the statement as offered flows from the declarant's belief about the matter. *Id.* 801(c).

Beginning with appellant's hearsay objection to Foreman's testimony that he obtained "new information" from AM, the trial court never actually allowed Foreman to state what the new information was, nor was any statement asserting that particular matter admitted. Because no out-of-court statement from AM was admitted through Foreman's reference to "new information," the trial court properly overruled appellant's hearsay objection. *See Perez v. State*, No. 13–13–00305– CR, 2014 WL 1260989, at *2 (Tex. App.—Corpus Christi Jan. 23, 2014, no pet.) (mem. op., not designated for publication) (no hearsay was admitted by witness's testimony that "kids told her"

something where witness never actually testified about any particular statements made by the children).

As for Detective Foreman's testimony regarding Nakia's statement that AM "was fine," this statement was cumulative of other evidence that was already before the jury. The detective had previously testified that Garner told him, at the CAC, that AM had eaten cereal earlier in the day and played, and "[h]e was absolutely fine." In addition, during his second recorded interview with appellant Foreman stated that Nakia had told him AM "was fine" earlier on the day of the offense.

The erroneous admission of hearsay testimony is harmless if the same facts are proved by other, properly admitted evidence. *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999). Thus, even if we assume error in the admission of Foreman's testimony regarding a statement allegedly made by AM's mother, the error was harmless. *See* TEX. R. APP. P. 44.2(b). We overrule appellant's fifth issue.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. 47.2(b)
171445F.U05

−20−



## Court of Appeals
## Fifth District of Texas at Dallas
# JUDGMENT

TRAVIS TYRELL MCGEE, Appellant

No. 05-17-01445-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 296th Judicial District Court, Collin County, Texas
Trial Court Cause No. 296-82415-2015.
Opinion delivered by Justice Myers.
Justices Osborne and Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 7th day of May, 2019.